FILED

JUN 2 1 2013

*Nancy Webbe*

FRANKLIN COUNTY
CIRCUIT CLERK

IN THE CIRCUIT COURT
OF THE SECOND JUDICIAL CIRCUIT
FRANKLIN COUNTY ILLINOIS

| | | |
|---|---|---|
| REND LAKE CONSERVANCY DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. ∂013-L-42 |
| | ) | |
| SIEMENS WATER TECHNOLOGIES CORP., | ) | |
| CDM SMITH INC., f/k/a CAMP DRESSER | ) | |
| & MCKEE INC., LANCE SCHIDEMAN, and | ) | |
| RANDY ROGERS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Now comes Plaintiff, Rend Lake Conservancy District ("RLCD"), by and through its

attorneys, Jeffrey S. Hebrank and Noel L. Smith, Jr. of HeplerBroom, LLC, and for its complaint

against Defendants, Siemens Water Technologies Corporation ("Siemens"), CDM Smith Inc.,

f/k/a Camp Dresser & McKee, Inc. ("CDM"), Lance Schideman ("Schideman") and Randy

Rogers ("Rogers") states as follows:

### JURISDICTION & VENUE

1.     Rend Lake Conservancy District ("RLCD") is a local unit of government

organized under the Illinois River Conservancy Districts Act which provides water to southern

Illinois.  RLCD's administrative office and the Rend Lake Water Treatment Plant ("WTP") are

located in Benton, Illinois.

2.     Siemens Water Technologies Corporation ("Siemens") is a corporation organized

under the laws of Massachusetts with its principal place of business in Iowa.  It can be served

through its registered agent C T Corporation System, 208 So. LaSalle St., Suite 814, Chicago, IL

60604.

## Exhibit A

3.      CDM Smith Inc., f/k/a Camp Dresser & McKee Inc. ("CDM"), is a corporation organized under the laws of Massachusetts with its principal place of business in Massachusetts. It can be served through its registered agent C T Corporation System, 208 So. LaSalle St., Suite 814, Chicago, IL 60604.

4.      Lance Schideman is a resident of the State of Illinois.

5.      Randy Rogers is a resident of the State of Illinois.

6.      Venue is proper in this Judicial District as to all Defendants in that a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District.

7.      Venue is also proper in this Judicial District as to Siemens as it agreed to venue in this Judicial District.

<div align="center">

## COUNT I

### (BREACH OF CONTRACT)

</div>

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys HeplerBroom, LLC, and for Count I of its complaint against the Defendant, Siemens Water Technologies Corporation ("Siemens"), hereby states as follows:

8.      On August 9, 2007, RLCD and Siemens entered into an agreement entitled "Goods and Special Services Agreement" (a copy of which is attached hereto as Exhibit "A" and incorporated herein) which outlined duties and responsibilities related to the sale of a membrane filtration system for use in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch Road, Benton, Illinois 62812.

9.      Pursuant to the agreement, Siemens would provide a membrane filtration system with a total capacity of 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was already in use at the WTP.

<div align="center">

**Exhibit A**

</div>

10.     Siemens breached the contract in one or more of the following ways:

    (a) The membrane filtration system does not deliver the rated capacity of 10-MGD;

    (b) Many membrane modules have cracked or otherwise failed and do not function;

    (c) The defective membrane modules have not been replaced;

    (d) Siemens has failed to perform all necessary corrections at its cost to comply with the agreement;

    (e) Final operating and maintenance manuals have not been provided;

    (f) Draft manuals place restrictions on operations not provided for in the project specifications;

    (g) The membrane filtration system does not function using the water chemistry that was already in use at the WTP;

    (h) Siemens guaranteed that the membrane filtration system would meet the design specifications which included the use of certain chemicals such as sodium hypochlorite, sodium dioxide, lime, alum, ferric sulfate, powdered activated carbon (PAC), carbon dioxide and polymer when the system cannot operate using all of these chemicals;

    (i) Siemens was not familiar with the nature and extent of the Contract Documents and Work, as defined in the agreement, that would affect cost, progress, performance or furnishing of the goods and special services;

    (j) Siemens did not carefully study all examinations, investigations, explorations, tests and studies which would affect the cost, progress, performance or furnishing of the goods and special services provided for in the agreement;

    (k) Siemens did not provide a fully functional membrane filtration system that could be used with the WTP's existing water chemistry;

    (l) Siemens failed to notify RLCD of all conflicts, errors, omissions, ambiguities and discrepancies related to the use of its membrane filtration system.

11.     RLCD performed its obligations under the contract.

12.     RLCD has not accepted the membrane filtration system as the goods and services provided to it do not conform to the contract requirements.

13.     As a direct and proximate result of these violations, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; and for additional costs associated with operating the membrane filtration system. Moreover, as a direct and proximate result of Siemens' breach, RLCD will be forced to incur substantial costs

**Exhibit A**

for the repair, replacement, and/or restoration of a filtration system, including its component

parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of

judgment in its favor against Defendant, Siemens Water Technologies Corporation, for an

amount in excess of $75,000, plus interest, and its costs associated with prosecution of this suit.

## COUNT II

### (FRAUDULENT MISREPRESENTATIONS)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys

HeplerBroom, LLC, and for Count II of its complaint against the Defendant, Siemens Water

Technologies Corporation ("Siemens"), hereby states as follows:

14.     On August 9, 2007, RLCD and Siemens entered into an agreement entitled

"Goods and Special Services Agreement" (a copy of which is attached hereto as Exhibit "A" and

incorporated herein) which outlined duties and responsibilities related to the sale of a membrane

filtration system for use in upgrading and expanding the Rend Lake Water Treatment Plant

("WTP") located at 11228 Marcum Branch Road, Benton, Illinois 62812.

15.     Pursuant to the agreement, the total capacity of the membrane filtration system

was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was

already in use at the WTP.

16.     Siemens was required to notify RLCD of all conflicts, errors, omissions,

ambiguities or discrepancies related to the use of its membrane filtration system.

17.     Siemens represented that its membrane filtration system met the requirements and

specifications of the project.

<div align="center">

**Exhibit A**

</div>

18.     At the time that Siemens made these representations, it knew them to be false or made them in reckless disregard of whether they were true or false and intended RLCD to rely upon these representations in order to cause the sale of the membrane filtration system to go forward.

19.     RLCD relied upon the representations made by Siemens in agreeing to use Siemens' membrane filtration system to upgrade and expand the WTP.

20.     The membrane filtration system did not perform using RLCD's original water chemistry.

21.     The membrane filtration system did not meet the required capacity of 10-MGD.

22.     Many of the membranes cracked or otherwise failed during use.

23.     RLCD could not have discovered the truth about Siemens' membrane filtration system.

24.     As a direct and proximate result of Siemens' misrepresentations and RLCD's reliance upon those misrepresentations, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; for additional costs unanticipated by RLCD; and for additional costs associated with operating the membrane filtration system.  Moreover, as a direct and proximate result of Siemens' misrepresentations and RLCD's reliance upon those misrepresentations, RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, Siemens Water Technologies Corporation, for an

**Exhibit A**

amount in excess of $75,000, plus interest, plus its attorney's fees and its costs associated with prosecution of this suit, and for punitive damages.

## COUNT III

### (FRAUDULENT CONCEALMENT)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys HeplerBroom, LLC, and for Count III of its complaint against the Defendant, Siemens Water Technologies Corporation ("Siemens"), hereby states as follows:

25.     On August 9, 2007, RLCD and Siemens entered into an agreement entitled "Goods and Special Services Agreement" (a copy of which is attached hereto as Exhibit "A" and incorporated herein) which outlined duties and responsibilities related to the sale of a membrane filtration system for use in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch Road, Benton, Illinois 62812.

26.     Pursuant to the agreement, the total capacity of the membrane filtration system was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was already in use at the WTP.

27.     Siemens was required to notify RLCD of all conflicts, errors, omissions, ambiguities or discrepancies related to the use of its membrane filtration system.

28.     Many of the membranes cracked or otherwise failed during use.

29.     Siemens concealed from RLCD that some or all of its membranes would crack or otherwise fail after use.

30.     Siemens knew that some or all of its membranes would crack or otherwise fail after use.

**Exhibit A**                                    Page 6 of 29

31.     In concealing this information, Siemens intended to induce in RLCD the false belief that its membrane filtration system could be used to produce 10-MGD.

32.     RLCD could not have discovered the truth about the defects with Siemens' membrane filtration system.

33.     RLCD would not have used Siemens' membrane filtration system to expand its WTP if it had known the truth about Siemens' product.

34.     As a direct and proximate result of Siemens' concealment of material facts, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; for additional costs unanticipated by RLCD; and for additional costs associated with operating the membrane filtration system.  Moreover, as a direct and proximate result of Siemens's concealment of material facts, RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, Siemens Water Technologies Corporation, for an amount in excess of $75,000, plus interest, plus its attorney's fees and its costs associated with prosecution of this suit, and for punitive damages.

## COUNT IV

### (BREACH OF EXPRESS WARRANTY)

In the alternative, and without alleging that Defendant, Siemens Water Technologies Corporation, has substantially complied with or completed its contractual obligations owed to Plaintiff, now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys

**Exhibit A**

HeplerBroom, LLC, and for Count IV of its complaint against the Defendant, Siemens Water

Technologies Corporation ("Siemens"), hereby states as follows:

35.     On August 9, 2007, RLCD and Siemens entered into an agreement entitled

"Goods and Special Services Agreement" (a copy of which is attached hereto as Exhibit "A" and

incorporated herein) (hereinafter referred to as "the Contract") which outlined duties and

responsibilities related to the sale of a membrane filtration system for use in upgrading and

expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch

Road, Benton, Illinois 62812.

36.     In the Contract, Siemens made certain affirmations of facts, promises,

descriptions of goods, all of which became part of the basis of the bargain between RLCD and

Siemens.

37.     These affirmations of facts, promises, and descriptions of goods include, but are

not limited to, the following:

      a)     "[E]quipment shall be designed and fabricated in accordance with best practices and methods and shall operate satisfactorily…" (See "Exhibit A," § 01136, Art. 1.04.B);

      b)     "[A]ll equipment furnished under this specification shall be new and shall be the standard product of a manufacturer who is fully experienced, reputable, qualified and regularly engaged for at least 5 years in the manufacture of SMF systems similar to the equipment to be furnished." (See "Exhibit A," § 11300-A, Art. 1.02.A);

      c)     "[T]he system provided for under this Specification shall be complete and operable in all respects, including, but not limited to, connections to other facilities, component and system tests, calibration, alignment, and adjustments as necessary to place the system in operation to perform its intended function." (See "Exhibit A," § 11300-A, Art. 2.01.B.1);

      d)     "[C]hemicals that may be applied to the water prior to membrane filtration include sodium hypochlorite, sodium dioxide, lime, alum, ferric sulfate, carbon dioxide, and polymer." (See "Exhibit A," § 11300-A, Art. 2.01.B.1.a);

**Exhibit A**                                         Page 8 of 29

e)    "[A]ll Goods and Special Services will conform to the Contract
Documents…and the Goods will be free from defects in material and
workmanship." (See "Exhibit A," § 00800, Art. 13.B).

38.    The above-referenced affirmations of facts, promises, and descriptions of goods

constitute express warranties pursuant to the Illinois Commercial Code, 810 ILCS 5/2-313 and

became part of the Contract between RLCD and Siemens.

39.    Siemens breached the above-referenced warranties by, among other things, failing

to design and fabricate a membrane filtration system in accordance with the best practices and

methods and that operates satisfactorily.

40.    Siemens further breached the above-referenced warranties by failing to design,

fabricate, and sell to RLCD a membrane filtration system that is operable in all respects, to

which expressly-referenced chemicals may be applied, and that are free from defects in material

and workmanship.

41.    As a direct and proximate result of Siemens' breach of express warranties, RLCD

has suffered, and will continue to suffer, damages, including, but not limited to, goods and

services paid but not rendered; for construction costs; for additional costs associated with

operating the membrane filtration system; and for inconvenience, aggravation, and loss of use.

Moreover, as a direct and proximate result of Siemens' breach of warranties, RLCD will be

forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration

system, including its component parts and labor costs associated with such repair, replacement,

and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of

judgment in its favor against Defendant, Siemens Water Technologies Corporation, for an

amount in excess of $75,000, plus interest, and its costs associated with prosecution of this suit.

**Exhibit A**                                    Page 9 of 29

## COUNT V

### (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

In the alternative, and without alleging that Defendant, Siemens Water Technologies

Corporation, has substantially complied with or completed its contractual obligations owed to

Plaintiff, now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys

HeplerBroom, LLC, and for Count V of its complaint against the Defendant, Siemens Water

Technologies Corporation ("Siemens"), hereby states as follows:

42.     On August 9, 2007, RLCD and Siemens entered into an agreement entitled

"Goods and Special Services Agreement" (a copy of which is attached hereto as Exhibit "A" and

incorporated herein) (hereinafter referred to as "the Contract") which outlined duties and

responsibilities related to the sale of a membrane filtration system for use in upgrading and

expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch

Road, Benton, Illinois 62812.

43.     In executing the Contract, Siemens warranted that the membrane filtration system

it was to supply to RLCD was merchantable.

44.     At all times relevant herein, Siemens was a merchant with respect to membrane

filtration systems and other similar products.

45.     Siemens breached said warranty of merchantability as follows:

    a)    Failed to manufacture and sell a membrane filtration system that passed to
           RLCD without objection;

    b)    Failed to manufacture and sell a membrane filtration system that was of
           fair and average quality;

    c)    Failed to manufacture and sell a membrane filtration system that was fit
           for the ordinary purpose for which the system is ordinarily used;

**Exhibit A**

       d)      Failed to manufacture and sell a membrane that conformed to the promises and affirmations of fact made by Siemens and required by the Contract.

46.     As a direct and proximate result of Siemens' breach of the implied warranty of merchantability, RLCD has suffered, and will continue to suffer, damages, including, but not limited to, goods and services paid but not rendered; for construction costs; for additional costs associated with operating the membrane filtration system; and for inconvenience, aggravation, and loss of use.  Moreover, as a direct and proximate result of Siemens' breach, RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, Siemens Water Technologies Corporation, for an amount in excess of $75,000, plus interest, and its costs associated with prosecution of this suit.

## COUNT VI

## (BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE)

In the alternative, and without alleging that Defendant, Siemens Water Technologies Corporation, has substantially complied with or completed its contractual obligations owed to Plaintiff, now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys HeplerBroom, LLC, and for Count VI of its complaint against the Defendant, Siemens Water Technologies Corporation ("Siemens"), hereby states as follows:

47.     On August 9, 2007, RLCD and Siemens entered into an agreement entitled "Goods and Special Services Agreement" (a copy of which is attached hereto as Exhibit "A" and incorporated herein) (hereinafter referred to as "the Contract") which outlined duties and responsibilities related to the sale of a membrane filtration system for use in upgrading and

<div align="center">

**Exhibit A**

</div>

expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch
Road, Benton, Illinois 62812.

48.     Prior to and at the time of execution of the Contract, Siemens knew or had reason
to know of the purpose for which RLCD was purchasing the membrane filtration system.

49.     In contracting with Siemens for the sale of the membrane filtration system, RLCD
relied upon Siemens to select and provide a suitable membrane filtration system.

50.     At all times relevant herein, Siemens knew or had reason to know that RLCD
relied upon Siemens to select and provide a suitable membrane filtration system.

51.     Siemens failed to provide to RLCD a membrane filtration system that was
suitable or fit for the purposes for which RLCD intended to use said system.

52.     As a direct and proximate result of Siemens' breach of the implied warranty of
fitness for a particular use, RLCD has suffered, and will continue to suffer, damages, including,
but not limited to, goods and services paid but not rendered; for construction costs; for additional
costs associated with operating the membrane filtration system; and for inconvenience,
aggravation, and loss of use.  Moreover, as a direct and proximate result of Siemens' breach,
RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a
filtration system, including its component parts and labor costs associated with such repair,
replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of
judgment in its favor against Defendant, Siemens Water Technologies Corporation, for an
amount in excess of $75,000, plus interest, and its costs associated with prosecution of this suit.

**Exhibit A**

## COUNT VII

### (BREACH OF CONTRACT)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys

HeplerBroom, LLC, and for Count VII of its complaint against the Defendant, CDM Smith Inc.,

f/k/a Camp Dresser & McKee Inc. ("CDM"), hereby states as follows:

53.     On September 25, 2006, RLCD and CDM entered into an agreement entitled

"Agreement Between Owner and Engineer for Water Treatment Plant Design Professional

Services" (a copy of which is attached hereto as Exhibit "B" and incorporated herein) which

outlined duties and responsibilities related to the design of a membrane filtration system for use

in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228

Marcum Branch Road, Benton, Illinois 62812.

54.     Pursuant to the agreement, CDM was to design a membrane filtration system with

a total capacity of 10 million gallons of water per day ("10-MGD") utilizing the water chemistry

that was already in use at the WTP.

55.     CDM breached the contract in one or more of the following ways:

(a) The membrane filtration system as designed does not deliver the rated
    capacity of 10-MGD;
(b) Many membrane modules have cracked or otherwise failed and do not
    function;
(c) The membrane filtration system does not function using the water chemistry
    that was already in use at the WTP;
(d) CDM did not meet the standard of care for all professional engineering and
    related services it performed or furnished by selecting and recommending the
    use of Siemens' membrane filtration system.

56.     RLCD performed its obligations under the contract.

57.     As a direct and proximate result of these violations, RLCD has suffered damages

including but not limited to for goods and services paid but not rendered; for construction costs;

**Exhibit A**

and for additional costs associated with operating the membrane filtration system. Moreover, as a direct and proximate result of CDM's breach, RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, CDM Smith Inc., f/k/a Camp Dresser & McKee Inc., for an amount in excess of $75,000, plus interest, and its costs associated with prosecution of this suit.

## COUNT VIII

### (NEGLIGENT MISREPRESENTATIONS)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys HeplerBroom, LLC, and for Count VIII of its complaint against the Defendant, CDM Smith Inc., f/k/a Camp Dresser & McKee Inc. ("CDM"), hereby states as follows:

58.     On September 25, 2006, RLCD and CDM entered into an agreement entitled "Agreement Between Owner and Engineer for Water Treatment Plant Design Professional Services" (a copy of which is attached hereto as Exhibit "B" and incorporated herein) which outlined duties and responsibilities related to the design of a membrane filtration system for use in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch Road, Benton, Illinois 62812.

59.     Pursuant to the agreement, the total capacity of the membrane filtration system was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was already in use at the WTP.

**Exhibit A**

60.     The membrane filtration system failed to meet the capacity requirements utilizing the water chemistry already in use at the WTP.

61.     As part of its responsibilities related to the design of the expansion of RLCD's WTP, CDM provided information and recommendations to RLCD regarding water filtration systems, including membrane filtration systems manufactured by Siemens, to assist RLCD in its selection of a water filtration system.

62.     CDM misrepresented that Siemens' membrane filtration system would be an effective and economical way to expand the WTP's capacity by 10-MGD when it knew or should have known that the system would not operate given the WTP's use of certain chemicals and it knew or should have known that changes would need to be made to the WTP's existing chemistry which would result in increased costs and operating or maintenance requirements.

63.     CDM misrepresented that there would be costs savings for using a membrane filtration system to expand the WTP when it knew or should have known there would be additional costs.

64.     RLCD relied upon the aforementioned misrepresentations in selecting and purchasing Siemens' membrane filtration system for use in its WTP.

65.     RLCD relied upon these misrepresentations in proceeding with the construction of the water filtration system.

66.     As a direct and proximate result of these misrepresentations and RLCD's reliance upon them, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; and for additional costs associated with operating the membrane filtration system.  Moreover, as a direct and proximate result of CDM's misrepresentations and RLCD's reliance upon them, RLCD will be forced to incur substantial

costs for the repair, replacement, and/or restoration of a filtration system, including its

component parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of

judgment in its favor against Defendant, CDM Smith Inc., f/k/a Camp Dresser & McKee Inc., for

an amount in excess of $75,000, plus interest, and its costs associated with prosecution of this

suit.

## COUNT IX

### (FRAUDULENT MISREPRESENTATIONS)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys

HeplerBroom, LLC, and for Count IX of its complaint against the Defendant, CDM Smith Inc.,

f/k/a Camp Dresser & McKee Inc. ("CDM"), hereby states as follows:

67.     On September 25, 2006, RLCD and CDM entered into an agreement entitled

"Agreement Between Owner and Engineer for Water Treatment Plant Design Professional

Services" (a copy of which is attached hereto as Exhibit "B" and incorporated herein) which

outlined duties and responsibilities related to the design of a membrane filtration system for use

in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228

Marcum Branch Road, Benton, Illinois 62812.

68.     The membrane filtration system used in the project was manufactured by

Siemens.

69.     Pursuant to the agreement, the total capacity of the membrane filtration system

was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was

already in use at the WTP.

70.    CDM misrepresented that Siemens' membrane filtration system complied with the projects requirements including the requirements set forth in the Request for Proposals.

71.    CDM misrepresented that there would be cost savings for the operation of Siemens' membrane filtration system.

72.    CDM misrepresented that membrane technology is an effective, proven treatment technology.

73.    At the time that CDM made these misrepresentations, it knew them to be false or made them in reckless disregard of whether they were true or false and intended RLCD to rely upon these misstatements in order to cause the design and sale of the membrane filtration system to go forward.

74.    RLCD relied upon the misrepresentations made by CDM in agreeing to use Siemens' membrane filtration system to upgrade and expand the WTP.

75.    RLCD could not have discovered the truth about Siemens' membrane filtration system.

76.    As a direct and proximate result of CDM's misrepresentations and RLCD's reliance upon them, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; for additional costs unanticipated by RLCD; and for additional costs associated with operating the membrane filtration system. Moreover, as a direct and proximate result of CDM's misrepresentations and RLCD's reliance upon them, RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

**Exhibit A**                                          Page 17 of 29

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, CDM Smith Inc., f/k/a Camp Dresser & McKee Inc., for an amount in excess of $75,000, plus interest, plus its attorney's fees and its costs associated with prosecution of this suit, and for punitive damages.

## COUNT X

### (FRAUDULENT CONCEALMENT)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys HeplerBroom, LLC, and for Count X of its complaint against the Defendant, CDM Smith Inc., f/k/a Camp Dresser & McKee Inc. ("CDM"), hereby states as follows:

77.     On September 25, 2006, RLCD and CDM entered into an agreement entitled "Agreement Between Owner and Engineer for Water Treatment Plant Design Professional Services" (a copy of which is attached hereto as Exhibit "B" and incorporated herein) which outlined duties and responsibilities related to the design of a membrane filtration system for use in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch Road, Benton, Illinois 62812.

78.     The membrane filtration system used in the project was manufactured by Siemens.

79.     Pursuant to the agreement, the total capacity of the membrane filtration system was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was already in use at the WTP.

80.     The membrane filtration system did not perform using RLCD's original water chemistry.

81.     The membrane filtration system did not meet the required capacity of 10-MGD.

**Exhibit A**

82.     Many of the membranes cracked or otherwise failed during use.

83.     CDM concealed from RLCD that the membrane filtration system would not perform with the water chemistry already in use at the WTP.

84.     CDM knew that Siemens' membrane filtration system would not perform with the water chemistry already in use at the WTP.

85.     In concealing this information, CDM intended to induce in RLCD the false belief that Siemens' membrane filtration system could operate using the WTP's water chemistry and could produce 10-MGD.

86.     RLCD could not have discovered the truth about the defects with Siemens' membrane filtration system.

87.     RLCD would not have used Siemens' membrane filtration system to expand its WTP if it had known the truth about Siemens' product.

88.     CDM had a duty to inform RLCD that its original water chemistry was incompatible with Siemens' membrane filtration system, that in order to use Siemens' membrane filtration system changes would need to be made to RLCD's operations and that these changes would result in additional costs and operating and maintenance requirements.

89.     As a direct and proximate result of CDM's concealment of material facts, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; for additional costs unanticipated by RLCD; and for additional costs associated with operating the membrane filtration system.  Moreover, as a direct and proximate result of CDM's concealment of material facts, RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

**Exhibit A**

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, CDM Smith Inc., f/k/a Camp Dresser & McKee Inc. ("CDM"), for an amount in excess of $75,000, plus interest, plus its attorney's fees and its costs associated with prosecution of this suit, and for punitive damages.

## COUNT XI

### (FRAUDULENT MISREPRESENTATIONS)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys HeplerBroom, LLC, and for Count XI of its complaint against the Defendant, LANCE SCHIDEMAN ("Schideman"), hereby states as follows:

90.     On September 25, 2006, RLCD and CDM entered into an agreement entitled "Agreement Between Owner and Engineer for Water Treatment Plant Design Professional Services" (a copy of which is attached hereto as Exhibit "B" and incorporated herein) which outlined duties and responsibilities related to the design of a membrane filtration system for use in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch Road, Benton, Illinois 62812.

91.     The membrane filtration system used in the project was manufactured by Siemens.

92.     Pursuant to the agreement, the total capacity of the membrane filtration system was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was already in use at the WTP.

93.     At all relevant times, Schideman was employed by CDM as a lead process engineer working on the WTP expansion project.

**Exhibit A**

94.    In his role as lead process engineer and while acting on behalf of and at the

direction of CDM, Schideman misrepresented that:

    a)  Siemens' membrane filtration system met the requirements and specifications
       for the expansion project;
    b)  Siemens' membrane filtration system was compatible with the water
       chemistry that was already in use at the WTP;
    c)  Changing to a membrane filtration system would not delay the WTP
       expansion project;
    d)  A membrane filtration system, including Siemens' system, was an effective
       way to filter water.

95.    At the time that Schideman made these misrepresentations, he knew them to be

false or made them in reckless disregard of whether they were true or false and intended RLCD

to rely upon these misrepresentations in order to cause the sale of the membrane filtration system

to go forward.

96.    RLCD relied upon the misrepresentations made by Schideman in agreeing to use

Siemens' membrane filtration system to upgrade and expand the WTP.

97.    The membrane filtration system did not perform using the various chemicals

already in use at the WTP.

98.    RLCD could not have discovered the truth about Siemens' membrane filtration

system.

99.    As a direct and proximate result of Schideman's misrepresentations and RLCD's

reliance upon them, RLCD has suffered damages including but not limited to for goods and

services paid but not rendered; for construction costs; for additional costs unanticipated by

RLCD; and for additional costs associated with operating the membrane filtration system.

Moreover, as a direct and proximate result of Schideman's misrepresentations and RLCD's

reliance upon them, RLCD will be forced to incur substantial costs for the repair, replacement,

<div align="center">**Exhibit A**</div>

and/or restoration of a filtration system, including its component parts and labor costs associated
with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of
judgment in its favor against Defendant, Lance Schideman, for an amount in excess of $75,000,
plus interest, plus its attorney's fees and its costs associated with prosecution of this suit.

### COUNT XII

### (FRAUDULENT CONCEALMENT)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys
HeplerBroom, LLC, and for Count XII of its complaint against the Defendant, Lance Schideman
("Schideman"), hereby states as follows:

100.    On September 25, 2006, RLCD and CDM entered into an agreement entitled
"Agreement Between Owner and Engineer for Water Treatment Plant Design Professional
Services" (a copy of which is attached hereto as Exhibit "B" and incorporated herein) which
outlined duties and responsibilities related to the design of a membrane filtration system for use
in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228
Marcum Branch Road, Benton, Illinois 62812.

101.    The membrane filtration system used in the project was manufactured by
Siemens.

102.    Pursuant to the agreement, the total capacity of the membrane filtration system
was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was
already in use at the WTP.

103.    The membrane filtration system did not perform using RLCD's original water
chemistry.

**Exhibit A**

104.   The membrane filtration system did not meet the required capacity of 10-MGD.

105.   Many of the membranes cracked or otherwise failed during use.

106.   Schideman concealed from RLCD that the membrane filtration system would not perform with the water chemistry already in use at the WTP.

107.   Schideman knew that the membrane filtration system would not perform with the water chemistry already in use at the WTP.

108.   In concealing this information, Schideman intended to induce in RLCD the false belief that Siemens' membrane filtration system could operate using the WTP's water chemistry and could produce 10-MGD.

109.   RLCD could not have discovered the truth about the defects with Siemens' membrane filtration system.

110.   RLCD would not have used Siemens' membrane filtration system to expand its WTP if it had known the truth about Siemens' product.

111.   Schideman had a duty to inform RLCD that its original water chemistry was incompatible with Siemens' membrane filtration system, that in order to use Siemens' membrane filtration system changes would need to be made to RLCD's operations and that these changes would result in additional costs and operating and maintenance requirements.

112.   As a direct and proximate result of Schideman's concealment of material facts, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; for additional costs unanticipated by RLCD; and for additional costs associated with operating the membrane filtration system.  Moreover, as a direct and proximate result of Schideman's concealment of material facts, RLCD will be forced to incur

**Exhibit A**

substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, Lance Schideman, for an amount in excess of $75,000, plus interest, plus its attorney's fees and its costs associated with prosecution of this suit, and for punitive damages.

## COUNT XIII

### (FRAUDULENT MISREPRESENTATIONS)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys HeplerBroom, LLC, and for Count XIII of its complaint against the Defendant, Randy Rogers ("Rogers"), hereby states as follows:

113.    On September 25, 2006, RLCD and CDM entered into an agreement entitled "Agreement Between Owner and Engineer for Water Treatment Plant Design Professional Services" (a copy of which is attached hereto as Exhibit "B" and incorporated herein) which outlined duties and responsibilities related to the design of a membrane filtration system for use in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch Road, Benton, Illinois 62812.

114.    The membrane filtration system to be used in the project was manufactured by Siemens.

115.    Pursuant to the agreement, the total capacity of the membrane filtration system was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was already in use at the WTP.

**Exhibit A**

116.    CDM intentionally misrepresented that Siemens' membrane filtration system would operate utilizing the water chemistry that was already in use at the WTP.

117.    At the time that CDM made these representations, it knew them to be false and intended RLCD to rely upon these fraudulent and deceptive statements in order to cause the sale of the membrane filtration system to go forward.

118.    RLCD relied upon the statements made by CDM in agreeing to use Siemens' membrane filtration system to upgrade and expand the WTP.

119.    The membrane filtration system did not perform using the various chemicals already in use at the WTP.

120.    RLCD could not have discovered the truth about Siemens' membrane filtration system.

121.    At all relevant times herein, Rogers was employed by CDM as a Regional Manager and was acting on behalf of and at the direction of CDM.

122.    After the membrane filtration system failed to operate using RLCD's original water chemistry, Rogers misrepresented to RLCD that changes to the system would be made to achieve the original project requirements.

123.    Rogers further misrepresented that the costs associated with these changes would be limited to a certain amount when in fact the costs exceeded his stated amount.

124.    At the time that Rogers made these misrepresentations, he knew them to be false or made them in reckless disregard of whether they were true or false and intended RLCD to rely upon these misrepresentations.

125.    RLCD relied upon the statements made by Rogers.

**Exhibit A**                    Page 25 of 29

126.   As a direct and proximate result of these misrepresentations and RLCD's reliance upon them, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; for additional costs unanticipated by RLCD; and for additional costs associated with operating the membrane filtration system.  Moreover, as a direct and proximate result of these misrepresentations and RLCD's reliance upon them, RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, Randy Rogers, for an amount in excess of $75,000, plus interest, plus its attorney's fees and its costs associated with prosecution of this suit.

## COUNT XIV

### (FRAUDULENT CONCEALMENT)

Now comes the Plaintiff, Rend Lake Conservancy District ("RLCD"), by its attorneys HeplerBroom, LLC, and for Count XIV of its complaint against the Defendant, Randy Rogers ("Rogers"), hereby states as follows:

127.   On September 25, 2006, RLCD and CDM entered into an agreement entitled "Agreement Between Owner and Engineer for Water Treatment Plant Design Professional Services" (a copy of which is attached hereto as Exhibit "B" and incorporated herein) which outlined duties and responsibilities related to the design of a membrane filtration system for use in upgrading and expanding the Rend Lake Water Treatment Plant ("WTP") located at 11228 Marcum Branch Road, Benton, Illinois 62812.

**Exhibit A**

128.    The membrane filtration system to be used in the project was manufactured by Siemens.

129.    Pursuant to the agreement, the total capacity of the membrane filtration system was 10 million gallons of water per day ("10-MGD") utilizing the water chemistry that was already in use at the WTP.

130.    The membrane filtration system did not perform using the various chemicals already in use at the WTP and did not produce 10-MGD.

131.    At all relevant times herein, Randy Rogers was employed by CDM as a Regional Manager and was acting on behalf of and at the direction of CDM.

132.    After the system failed to operate using the WTP's original water chemistry, CDM proposed and attempted various changes to the system.

133.    Rogers concealed from RLCD that the changes to the membrane filtration system would result in additional costs and increased operating and maintenance requirements in excess of what was represented to RLCD by Rogers.

134.    Rogers knew that the changes to membrane filtration system would result in increased costs, increased sludge production, increased carbon dioxide use and increased operating and maintenance requirements but did not inform RLCD of these issues.

135.    In concealing this information, Rogers intended to induce in RLCD the false belief that the changes would result in a system in compliance with the original contract specifications and requirements and that the costs would be within a certain range.

136.    The membrane filtration system did not conform with the project requirements after the changes and the costs resulting from the changes exceeded the amounts claimed by Rogers.

**Exhibit A**

137.   RLCD could not have discovered the truth about the changes to the system.

138.   Rogers had a duty to inform RLCD that there would be increased costs, increased sludge production and increased carbon dioxide use with the changes being proposed and made to the membrane filtration system.

139.   As a direct and proximate result of these acts of concealment, RLCD has suffered damages including but not limited to for goods and services paid but not rendered; for construction costs; for additional costs unanticipated by RLCD; and for additional costs associated with operating the membrane filtration system.  Moreover, as a direct and proximate result of these acts of concealment, RLCD will be forced to incur substantial costs for the repair, replacement, and/or restoration of a filtration system, including its component parts and labor costs associated with such repair, replacement, and/or restoration.

WHEREFORE, the Plaintiff, Rend Lake Conservancy District, prays for entry of judgment in its favor against Defendant, Randy Rogers, for an amount in excess of $75,000, plus interest, plus its attorney's fees and its costs associated with prosecution of this suit.

**PLAITIFF DEMANDS A TRIAL
BY JURY ON ALL COUNTS**

Respectfully submitted,

HEPLERBROOM LLC

By: _____
JEFFREY S. HEBRANK #06182800
NOEL L. SMITH, JR. #06275947
Attorneys for Plaintiff
130 North Main Street
P.O. Box 510
Edwardsville, Illinois 62025-0510
Phone:  (618) 656-0184
Fax: (618) 656-1364

**Exhibit A**

J. LAWRENCE SANDERS #06181346
General Counsel
Rend Lake Conservancy District
P.O. Box 907
11228 Marcum Branch Rd.
Benton, IL 62812

**Exhibit A**

I:\Users\Dean\ContractCDM.doc
March 28, 2007

SECTION 00500

GOODS AND SPECIAL SERVICES AGREEMENT

THIS GOODS AND SPECIAL SERVICES AGREEMENT, hereafter referred to as the "Agreement," made as of the 9ᵗʰ day of August in the year 2007 by and between Rend Lake Conservancy District, Benton, Illinois hereinafter called OWNER and Siemens Water Technologies Corp. with legal address and principal place of business at 1400 Aarasmith Trail, Ames, IA 50010 hereinafter called MFSS. OWNER and MFSS in consideration of the mutual covenants hereinafter set forth, agree as follows:

ARTICLE 1. GOODS AND SPECIAL SERVICES

1.1  MFSS shall furnish the Goods and Special Services as specified or indicated in the Contract Documents. The Goods and Special Services to be furnished are described in Section 01010, Summary of Work.

1.2  MFSS shall attend progress design meetings as required by ENGINEER. MFSS shall provide all necessary project documents required by ENGINEER for the successful design of the membrane filtration system.

ARTICLE 2. THE PROJECT

2.1  The Project for which the Goods and Special Services are to be provided under the Contract Documents is generally described as follows: The MFSS shall provide project design documentation, shop drawings, installation manuals, assistance to the ENGINEER in the design of the membrane filtration system, one-year performance pilot testing at the Rend Lake WTP, shall attend progress design meetings, fabrication and delivery of membrane filtration equipment and ancillary components, assistance during installation of the goods, commissioning of the equipment, delivery of spare parts and operation and maintenance manuals, warranty of the membrane modules and system, testing of the equipment, and training of OWNER'S personnel.

2.2  The MFSS shall prepare and deliver separate Bonds and insurance certificates covering the applicable portions of the Contract in accordance with Article 4 of the General and Supplementary Conditions.

ARTICLE 3. ENGINEER

3.1  The Contract Documents have been prepared by Camp Dresser & McKee Inc., 125 South Wacker Drive, Suite 600, Chicago, IL 60606, who will act as ENGINEER in connection with the furnishing of Goods and Special Services in accordance with the Contract Documents.

ARTILCE 4. POINT OF DELIVERY

4.1  The place where the Goods are to be delivered is defined in the General and Supplementary Conditions as the point of delivery and is designated as Rend Lake Conservancy District WTP, 11231 Marcum Branch Road, Benton, Illinois 62812. Shop drawing submittals and design information shall be delivered to the ENGINEER, Camp Dresser & McKee Inc., 125 South Wacker Drive, Suite 600, Chicago, IL 60606.

Membrane Filtration System
Rend Lake Conservancy District

Section 00500 – Goods and Services Agreement – Addendum 1
Page 1 of 11

**Exhibit A**


EXHIBIT
A

l:\Users\Dean\ContractCDM.doc
March 28, 2007

ARTICLE 5. CONTRACT TIMES.

5.1   Time of the Essence

A.   All time limits for Milestones, if any, the delivery of Goods and the furnishing of Special
Services as stated in the Contract Documents are of the essence of the Contract, and accordingly
the parties have provided for liquidated damages in Article 8 of this Agreement.  The provision of
the first sentence of Paragraph 12.3 of the Procurement General Conditions is hereby superseded
in its entirety.

5.2   Days to Achieve Delivery of Goods

A.   All Shop Drawings and Samples required by the Contract Documents shall be submitted to the
OWNER for ENGINEER's review and approval in accordance with Section 01300 and the
following schedule:

1.   The MFSS shall have submitted to the ENGINEER all Shop Drawings associated with
the First Shop Drawing Submittal within 30 calendar days after the effective date of the
Agreement.

2.   The MFSS shall have submitted to the ENGINEER all Shop Drawings associated with
the Second Shop Drawing Submittal within 55 calendar days after the effective date of
the Agreement.

B.   MFSS will be assessed liquidated damages in accordance with Article 8 for failure to provide the
above Submittals within the specified times.

C.   The Goods are to be complete and ready for the OWNER's receipt of delivery at the Point of
Destination in accordance with the following schedule:

1.   MFSS shall not commence the manufacture of any Goods until the Shop Drawings have
been approved and the OWNER has issued a "Notice to Commence Fabrication."

2.   The Goods shall be fabricated and delivered to the Point of Destination in accordance
with the Schedule for Delivery of Goods, to be developed and agreed upon by the
OWNER, MFSS, ENGINEER, and General Contractor for the installation of the Goods
prior to the issuance of the "Notice to Commence Fabrication".  The MFSS shall accept a
Schedule for Delivery of Goods that requires the Goods to be fabricated and delivered to
the Point of Destination in as few as 150 days after the "Notice to Commence
Fabrication" is issued.

3.   All Goods shall be fabricated and delivered to the Point of Destination according to the
Schedule for Delivery of Goods.  Each shipment of Goods specified in the Schedule of
Delivery of Goods shall be delivered to the Point of Destination within a period of time
from between four calendar days before to four calendar days after the date specified for
that shipment within the Schedule for Delivery of Goods.

4.   The MFSS shall be liable for liquidated damages in accordance with Paragraph 8.4 of the
Goods and Special Services Agreement for each shipment of Goods that is not fabricated
and delivered to the Point of Destination in accordance with the Schedule for Delivery of
Goods.

## Exhibit A

I:\Users\Dean\ContractCDM.doc
March 28, 2007

5.    The OWNER may, by Change Order, direct the MFSS to ship to another Point of
      Destination or to accelerate or postpone the delivery period. Any accelerated delivery
      shall require the written approval of the MFSS.

5.3  Project Milestones for Special Services and MFSS's Warranty and Guarantee.

A.  The furnishing of Special Services to the OWNER will commence upon the execution of the
    Goods and Services Agreement between the OWNER and the MFSS. The MFSS shall deliver all
    Special Services required by the Contract Documents based upon the following milestones.

1.  Special Services

    a.    Upon execution of the Agreement, the MFSS will begin to provide Special
          Services required for Shop Drawings and Samples.

    b.    Installation Manuals shall be delivered at the times indicated in Section 01730,
          Installation, Operation and Maintenance Manuals.

    c.    MFSS shall participate in progress design meetings and assist OWNER and
          ENGINEER in the design of the Membrane Filtration System.

    d.    All submittals shall be in accordance with Section 01300, Submittals.

    e.    Pilot test for a minimum of 12 months to meet IEPA requirements and to verify the
          proposed MFS operating conditions.

    f.    In accordance with Section 01620, Installation of Membrane Equipment, Special
          Services associated with the Installation of the Goods shall commence with the
          delivery of the Goods and shall be completed when the "Notice of Completed
          Installation" is issued by the ENGINEER.

    g.    In accordance with Section 01660, Commissioning of Membrane Equipment,
          commissioning shall commence after the "Notice of Completed Installation" is
          issued and the associated work has been completed. Upon completion of
          commissioning, a "Notice of Completed Commissioning" will be issued by the
          ENGINEER.

    h.    In accordance with Section 01715, Equipment Operation and Maintenance
          Training shall commence after the "Notice of Completed Commissioning" is
          issued. Upon completion of Operator Training, a "Notice of Completed Training"
          will be issued by the ENGINEER.

    i.    In accordance with Section 01670, Acceptance Testing of Membrane Equipment,
          acceptance testing shall not commence until after the prerequisite "Notice of
          Completed Training" is issued. Upon completion of Acceptance Testing, a "Notice
          of Substantial Completion of the Membrane Filtration System" will be issued by
          the ENGINEER.

    j.    In accordance with Section 01680, Operations Assistance, operations assistance
          shall be provided in accordance with the requirements of that Section.

Membrane Filtration System                          Section 00500 – Goods and Services Agreement – Addendum 1
Rend Lake Conservancy District                                                              Page 3 of 11

# Exhibit A

I:\Users\Dean\ContractCDM.doc
March 28, 2007

B. For the purposes of MFSS's warranty and guarantee, the following milestones are as follows:

1. In accordance with Section 01740, Warranties, the Membrane Module Warranty Period shall commence on the date the "Notice of Substantial Completion of the Membrane Filtration System" is issued.

2. The Correction Period shall commence on the date the "Notice of Completed Commissioning" is issued.

## ARTICLE 6. CONTRACT PRICE

6.1 OWNER will pay MFSS for furnishing the Goods and Special Services in accordance with the Contract Documents, including addenda numbers _____1_____ to _____1_____, inclusive, in current funds at the Contract Price agreed upon in the MFSS's Proposal Form attached to this Agreement.     *KLT*
*JCK*

6.2 MFSS shall furnish Goods and Special Services and accept in full payment the Contract Price of

Three million ninety-seven thousand ninety seven - Dollars ($ 3,097,097 )     *KLT*
*JCK*

)
                    (In words)                                                          (In numbers)

established in the Notice of Selection. The above amount is subject to additions and deductions by Change Order(s) to the Contract Price detailed in the Proposal Form. Payments will be made to the MFSS on the basis of the terms specified herein.

## ARTICLE 7. APPLICATIONS FOR PAYMENT

7.1 MFSS shall submit Applications for Payment in accordance with Article 6 of the General and Supplementary Conditions. Applications for Payment will be processed by ENGINEER as provided in the Conditions of the Contract, and as modified below. Applications for payment shall be submitted monthly by the MFSS.

7.2 Progress and Final Payment:

A. OWNER will make progress payments on account of the Contract Price on the basis of MFSS's Applications for Payment as recommended by ENGINEER, monthly during the Contract as provided below. All progress payments will be made on the basis of the furnishing, delivery to the Point of Destination and acceptance by OWNER in accordance with Article 5 of the General and Supplementary Conditions of the Contract of Goods and on the basis of Special Services furnished measured by the schedule of values provided for in Paragraph 7.19 in the Supplementary Conditions of the Contract.

1. OWNER shall provide a payment of 1% of the contract value for Special Services upon signing of this Agreement.

2. OWNER shall provide a payment of 2% of the contract value for Special Services based upon ENGINEER's recommendations for approval of MFSS's First Shop Drawing Submittal, less the aggregate of payments previously made.

# Exhibit A

I:\Users\Dean\ContractCDM.doc
March 28, 2007

    3.    OWNER shall provide a payment of 3% of the contract value for Special Services based upon ENGINEER's recommendations for approval of MFSS's Second Shop Drawing Submittal, less the aggregate of payments previously made.

    4.    OWNER shall provide a payment of 4% of the contract value for Special Services based upon ENGINEER's recommendations for approval of MFSS's Installation Manuals and other project documents, less the aggregate of payments previously made.

B.  After review and approval of all Shop Drawings and after OWNER has issued a "Notice to Commence Fabrication.", MFSS shall submit an Application for Payment in accordance with Article 6 of the General and Supplementary Conditions.  The OWNER shall provide payment of an amount equal to 20 percent of the Contract Price, less the aggregate of payments previously made.

C.  Prior to Substantial Completion of the Membrane Filtration System, progress payments will be made in an amount equal to 85 percent of the value of Goods delivered to the Point of Destination and accepted by OWNER in accordance with Article 5 of the Conditions of Contract and 85 percent of the value of Special Services furnished or as otherwise approved by ENGINEER, less in each case the aggregate of payments previously made and less such amounts as ENGINEER may determine in accordance with Article 6 of the General and Supplementary Conditions.

D.  If, during the course of the Contract, the MFSS forecasts a failure to complete the Work within the allotted Contract Times, as specified in Article 5 above, and, subsequently, in the opinion of the OWNER, fails to make a good faith effort to recover, then progress payments may be withheld at the discretion of the owner.

E.  Upon Substantial Completion of the Membrane Filtration System the OWNER shall pay an amount sufficient to increase total payments to MFSS to 95 percent of that portion of the Contract Price less such amounts to ENGINEER shall determine in accordance with Article 6 of the Conditions of the Contract.

F.  Final Payment.  Upon final completion, and acceptance of the Work in accordance with Article 6 of the Conditions of the Contract, OWNER shall pay the remainder of the Contract Price as recommended by ENGINEER as provided in Article 6.

ARTICLE 8.  LIQUIDATED DAMAGES
8.1  OWNER and MFSS recognize that time is of the essence of this Agreement and that OWNER will suffer financial loss if the Work is not completed within the Contract Time specified in Article 5 above, plus any extensions thereof allowed in accordance with Article 12 of the General Conditions. They also recognize that the timely performance by other parties involved in the OWNER's Project are materially dependent upon the MFSS's specific compliance with the requirements of Article 5 above plus any extensions thereof allowed in accordance with Article 12 of the General Conditions. Should MFSS fail to complete the Work within this time, OWNER may retain liquidated damages in accordance with this Agreement.  Liquidated damages set forth in this Article 8 shall constitute the Owner's sole and exclusive remedy for delay by MFSS in achieving any Milestones or dates for the delivery of Goods or furnishing of Special Services or Engineering.  In no event shall MFSS be required to pay liquidated damages to the extent that the payment of such damages would allow the aggregate of all such damages paid to exceed ten percent (10%) of the Contract Price.  It is

# Exhibit A

I:\Users\Dean\ContractCDM.doc
March 28, 2007

understood that the foregoing limitation is a subset of and not in addition to the limitation of liability set forth in Paragraph 11.8 of Article 11 of this agreement.

8.2 Provided, that MFSS shall not be charged with liquidated damages or any excess cost when the delay in completion of the Work is for reasons included in Article 12 of the General Conditions, or for reasons not the fault of, nor attributable to, the MFSS.

8.3 Provided, further, that MFSS shall furnish OWNER the required notification of such delays in accordance with Article 12 of the General Conditions.

8.4 Liquidated Damages

A. MFSS agrees to pay OWNER liquidated damages in the amount of five hundred dollars ($500) per calendar day that expires after the contract times or dates specified for the furnishing of Special Services in Paragraphs 5.2.A of Article 5 of this Agreement

B. MFSS agrees to pay OWNER liquidated damages in the amount of two thousand dollars ($2,000) for each calendar day that expires after the times or dates specified in Paragraph 5.2.C above for the delivery of Goods.

C. The liquidated damages are not a penalty but represent the fixed costs associated with OWNER's administrative fees and costs incurred by the OWNER's inability to place all or portions of this project into service within the time stipulated in the Agreement. The payment of liquidated damages shall not, however, prevent the OWNER from pursuing non-monetary remedies for breach of contract for failure to achieve final completion, or from pursuing other claims for remedies, monetary or non-monetary, for breach of contract not related to failure to achieve final completion.

D. The liquidated damages are not a penalty but represent the fixed costs associated with OWNER's administrative fees and costs incurred by the OWNER's inability to place all or portions of this project into service within the time stipulated in the Agreement. The payment of liquidated damages shall not, however, prevent the OWNER from pursuing non-monetary remedies for breach of contract or other claims for breach of contract not relating to failure to achieve final completion.

E. By execution of this Agreement, the OWNER and the MFSS expressly agree that these liquidated damage amounts are reasonable under the circumstances existing at the time this Agreement is executed.

8.5 The OWNER may deduct the amount of liquidated damages from monies due the MFSS under this Agreement.

ARTICLE 9. ASSURANCE

9.1 MFSS has familiarized itself with the nature and extent of the Contract Documents, Work, locality, and with all local conditions and Federal, State and local laws, ordinances, rules and regulations that in any manner may affect cost, progress or performance of the Work.

9.2 MFSS has carefully studied and correlated the information known to MFSS, and information and observations obtained from MFSS's visits, if any, to the Point of Destination, with the Contract Documents.

# Exhibit A

I:\Users\Dean\ContractCDM.doc
March 28, 2007

9.3  MFSS has given ENGINEER written notice of any conflicts, errors, omissions, ambiguities or discrepancies that it has discovered in the Contract Documents and the written resolution thereof by ENGINEER is acceptable to MFSS.

9.4  MFSS agrees that the Contract Documents are sufficient in scope and detail to indicate and convey understanding of all terms and conditions for furnishing Goods and Special Services.

9.5  During the development of the Contract Documents, the MFSS has provided information and design concepts for its proprietary membrane system. In providing the information and design concepts for this Project, the MFSS has considered and incorporated the concept of "linear scalability" into its design. Linear scalability means that; 1) the MFSS has considered and evaluated the design and operational requirements and the results of demonstration testing, and 2) that the equipment provided by the MFSS is warranted to be linearly scalable in proportion.

ARTICLE 10. CONTRACT DOCUMENTS

10.1  The Contract Documents which comprise the Contract between OWNER and MFSS are attached hereto and made a part hereof and consist of the specifications (Divisions 1 through 15), Invitation To Proposers, Instructions To Proposers, MFSS's Proposal, Goods and Special Services Agreement, Performance and Payment Bonds, insurance certificates, General and Supplementary Conditions, Appendices, all modifications and Addenda thereof incorporated into the Documents before execution of the Contract, and including all subsequent Change orders issued by OWNER, and all other requirements incorporated in these Documents by specific reference thereto.

10.2  The following shall be incorporated in the Contract Documents, which may be delivered or issued on or after the Effective Date of this Agreement and are not attached hereto:

A.  Notice of Selection

B.  Notice to Commence Fabrication

C.  Notice of Completed Installation

D.  Notice of Completed Commissioning

E.  Notice of Completed Training

F.  Notice of Substantial Completion of the Membrane Filtration System

G.  Final Acceptance

H.  Written Amendment(s)

I.  Change Order(s)

J.  ENGINEER's written interpretation(s)

10.3  There are no Contract Documents other than those listed in this Article 10.

## Exhibit A

J:\Users\Dean\ContractCDM.doc
March 28, 2007

10.4  In resolving inconsistencies or ambiguities among two (2) or more components of the Contract Documents unless otherwise noted, highest precedence shall be given to the Agreement and decreasing order as follows:

    A.  Goods and Special Services Agreement

    B.  General and Supplementary Conditions

    C.  Section 01740, Warranties

    D.  Performance Bond

    E.  Payment Bond

    F.  Certificates of Insurance

    G.  Addenda

    H.  Final Acceptance (s)

    I.  Change Order (s)

    J.  ENGINEER's written Interpretation (s)

    K.  Field Order (s)

    L.  Notice of Substantial Completion of the Membrane Filtration System

    M.  Notice of Completed Training

    N.  Notice of Completed Commissioning

    O.  Notice of Completed Installation

    P.  Notice to Commence Fabrication

    Q.  Specifications (Division 1 through 15) shall be used to govern the quality of the Goods.

10.5  In the event of a conflict between an accepted schedule or schedule update and a specific requirement of the Contract Documents, the Contract Documents shall, at all time, have precedence. Acceptance of a schedule or schedule update shall not waive any requirements of the Contract Documents.

ARTICLE 11. MISCELLANEOUS

11.1  Terms used in this Agreement which are defined in Article 1 of the Conditions of the Contract shall have the meanings assigned in the General and Supplementary Conditions of the Contract.

**Exhibit A**

I:\Users\Dean\ContractCDM.doc
March 28, 2007

11.2  Successors

    A  The OWNER and MFSS each binds itself, its partners, successors, and legal representatives to the other party hereto, its partners, successors and legal representatives in respect to all covenants, agreements and obligations contained in the Contract Documents.

11.3  Severability

    A.  Any provision or part of the Contract Documents held to be void or unenforceable under any Law or Regulation shall be deemed stricken, and all remaining provisions shall continue to be valid and binding upon the OWNER and MFSS.  The Contract Documents shall be reformed to replace such stricken provision or part thereof with a valid and enforceable provision that comes as close as possible to expressing the intention of the stricken provision.

11.4  Venue

    A.  The laws of the State of Illinois shall govern the formation, interpretation, and performance of this Agreement.  Venue for actions arising out of this Agreement shall be in Benton, Illinois.

11.5  Entire Agreement

    A.  This Agreement that includes the Contract Documents contains the entire agreement, between the parties and supersedes all prior negotiations, discussions, obligations, and rights of the parties in respect of each other regarding the subject matter of this Agreement.  There is no other written or oral understanding between the parties.  No modification, amendment or alteration of this Agreement shall be valid unless it is in writing and signed by the parties hereto.

11.6  Counterparts

    A.  This Agreement may be executed in counterparts, which when taken together shall constitute a single signed original as though all parties had executed the same page.

11.7  Authority to Execute Agreement:

    A.  Each party signing on behalf of a corporation, partnership, joint venture or governmental entity hereby declares that he, she, or it has the authority to sign on behalf of his, her or its respective corporation, partnership, joint venture, entity and agrees to hold the other party or parties hereto harmless if he, she or it does not have such authority.

11.8  MFSS'S Total Limitation of Liability:

    A.  NOTWITHSTANDING ANY OTHER PROVISIONS OF THE CONTRACT DOCUMENTS, THE MFSS's TOTAL LIABILITY ARISING AT ANY TIME UNDER ANY OF THE CONTRACT DOCUMENTS OR OTHERWISE IN CONNECTION WITH COMPLETING THE CONTRACT (WHETHER ARISING UNDER BREACH OF CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW) SHALL NOT EXCEED THE AMOUNT OF THE TOTAL CONTRACT PRICE FOR THE GOODS AND SPECIAL SERVICES AGREEMENT. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY, THE MFSS SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL,

**Exhibit A**

I:\Users\Dean\ContractCDM.doc
March 28, 2007

INCIDENTAL, SPECIAL, PUNITIVE OR OTHER INDIRECT DAMAGES, AND
THE MFSS's TOTAL LIABILITY ARISING AT ANY TIME FROM THE SALE OF
USE OF THE EQUIPMENT SHALL NOT EXCEED THE PURCHASE PRICE PAID
FOR THE EQUIPMENT. THESE LIMITATIONS APPLY WHETHER THE
LIABILITY IS BASED ON CONTRACT, TORT, STRICT LIABILITY, OR ANY
OTHER THEORY.

IN WITNESS WHEREOF, OWNER and MFSS have signed this Agreement in triplicate. One
counterpart each has been delivered to OWNER, MFSS, and ENGINEER. All portions of the Contract
Documents have been signed, initialed or identified by OWNER and MFSS or identified by ENGINEER
on their behalf.

This Agreement will be effective on _August 9, 2007_, (which is the effective Date of the
Agreement).

Attest:                                              Siemens Water Technologies Corp.
                                                              (MFSS)

_____          _____
            (Signature)                                      (Signature)

Address for giving notices:                      John C. Kiernan, Director of Sales
 333 South Street, Suite 300                      (Typed Name and Title) Memcor N.A.
 Shrewsbury, MA  01545-4197

(If MFSS is a corporation, attach evidence of authority to sign.)

MFSS's License No. _____ (If required by state or municipal law)

Attest:                                              Rend Lake Conservancy District

_____                      (OWNER)

_____          _____
            (Signature)                                      (Signature)

                                                   Keith Thomason, GM
                                                    (Typed Name and Title)

Address for giving notices:

 Rend Lake Conservancy District
 PO Box 907
 Benton  IL  62812

Approved as to form and execution this _8th_ day of _August_, 200 _7_.

Countersigned By: _____, General Counsel

Membrane Filtration System                      Section 00500 – Goods and Services Agreement – Addendum 1
Rend Lake Conservancy District                  Page 10 of 11

# Exhibit A

I:\Users\Dean\ContractCDM.doc
March 28, 2007

_____
City Attorney
(or other designated official)

**Exhibit A**

<div align="center">

**AGREEMENT**
**BETWEEN**
**OWNER AND ENGINEER**
**FOR**
**WATER TREATMENT PLANT DESIGN**
**PROFESSIONAL SERVICES**

</div>

THIS IS AN AGREEMENT made as of September 25, 2006 between the Rend Lake Conservancy District ("OWNER") and Camp Dresser & McKee Inc. ("ENGINEER").

OWNER intends to upgrade and expand its existing water treatment plant (the "Project").

OWNER and ENGINEER in consideration of their mutual covenants herein agree in respect of the performance or furnishing of services by ENGINEER with respect to the Project and the payment for those services by OWNER as set forth below. Execution of this Agreement by ENGINEER and OWNER constitutes OWNER's written authorization to ENGINEER to proceed on the date first above written with the Services described in Article 1 below. This Agreement will become effective on the date first above written.

<div align="center">

**ARTICLE 1 – SCOPE OF SERVICES**

</div>

1.1    ENGINEER agrees to perform for OWNER services as described in Exhibit A (hereinafter referred to as "Services") in accordance with the requirements outlined in this Agreement.

<div align="center">

**ARTICLE 2 – TIMES FOR RENDERING SERVICES**

</div>

2.1    The specific time period for the performance of ENGINEER's Services are set forth in Exhibit A.

2.2    If the specific periods of time for rendering services or specific dates by which  services are to be completed are changed through no fault of ENGINEER, the rates and amounts of compensation provided for herein shall be subject to equitable adjustment. If OWNER has requested changes in the scope, extent, or character of the Project, the time of performance and compensation for ENGINEER's services shall be adjusted equitably.

2.3    If ENGINEER's services are delayed or suspended in whole or in part by OWNER for more than three months through no fault of ENGINEER, ENGINEER shall be entitled to equitable adjustment of rates and amounts of compensation provided for elsewhere in this Agreement to reflect, among other things, reasonable costs incurred by ENGINEER in connection with such delay or suspension and reactivation and the fact that the time for performance under this Agreement has been revised; or

<div align="center">

**ARTICLE 3 – OWNER'S RESPONSIBILITIES**

</div>

OWNER shall do the following in a timely manner so as not to delay the services of ENGINEER and shall bear all costs incident thereto:

3.1    Pay the ENGINEER in accordance with the terms of this Agreement.

3.2    Designate in writing a person to act as OWNER's representative with respect to the services to be performed or furnished by ENGINEER under this Agreement. Such person will have the authority to transmit instructions, receive information, interpret, and define OWNER's policies and decisions with respect to ENGINEER's services for the Project.

3.3    Provide all criteria and full information as to OWNER's requirements for the Project, including, as

<div align="center">

**Exhibit A**

</div>

<div align="right">

**EXHIBIT**
**B**
tabbies

</div>

applicable to the Services, design objectives and constraints, space, capacity and performance requirements, flexibility and expandability, and furnish copies of all design and construction standards which OWNER will require to be included in the Drawings and Specifications.

3.4   Assist ENGINEER by placing at ENGINEER's disposal all available information pertinent to the Project including previous reports and, as applicable to the Services, any other data relative to design or construction of the Project, all of which ENGINEER shall be entitled to rely upon.

3.5   Give prompt written notice to ENGINEER whenever OWNER observes or otherwise becomes aware of any development that affects the scope or time of performance or furnishing of ENGINEER's Services or any defect or conformance in ENGINEER's Services or in the work of any Contractor.

3.6   Bear all costs incident to compliance with the requirements of this Article 3.

## ARTICLE 4 – PAYMENTS TO ENGINEER FOR SERVICES

4.1   Methods of Payment for Services of ENGINEER.

  4.1.1   OWNER shall pay ENGINEER for Services performed or furnished under this Agreement or as described in Exhibit A.

  4.1.2   Invoices for Services will be prepared in accordance with ENGINEER's standard invoicing practices and will be submitted to OWNER by ENGINEER at least monthly. Invoices are due and payable on receipt.

  4.1.3   If OWNER fails to make any payment due ENGINEER for services and expenses within sixty days after receipt of ENGINEER's invoice therefor, the amounts due ENGINEER will be increased at the rate of 1.0% per month (or the maximum rate of interest permitted by law, if less) from said thirtieth day; and, in addition, ENGINEER may, after giving seven days' written notice to OWNER, suspend services under this Agreement until ENGINEER has been paid in full all amounts due for services, expenses and charges.  Payments will be credited first to interest and then to principal. In the event of a disputed or contested billing, only that portion so contested may be withheld from payment, and the undisputed portion will be paid.

OWNER agrees to pay ENGINEER all costs of collection including but not limited to reasonable attorneys' fees, collection fees and court costs incurred by ENGINEER to collect properly due payments.

## ARTICLE 5 – GENERAL CONDITIONS

5.1   <u>Standard of Care</u>
The standard of care for all professional engineering and related services performed or furnished by ENGINEER under this Agreement will be the care and skill ordinarily used by members of ENGINEER's profession practicing under similar conditions at the same time and in the same locality.

5.2   <u>Opinions of Probable Construction Cost</u>
ENGINEER's opinions of probable Construction Cost, as applicable to the Services, provided for herein are to be made on the basis of ENGINEER's experience and qualifications and represent ENGINEER's best judgment as an experienced and qualified professional engineer generally familiar with the construction industry. However, since ENGINEER has no control over the cost of labor, materials, equipment, or services furnished by others, or over the Contractor's methods of determining prices, or over competitive bidding or market conditions, or when the Project will be constructed ENGINEER cannot and does not guarantee that proposals, bids, or actual Construction Cost will not vary from opinions of probable Construction Cost prepared by ENGINEER. If OWNER wishes greater assurance

# Exhibit A

as to probable Construction Cost, OWNER shall employ an independent cost estimator.

5.3   Termination

The obligation to provide further services under this Agreement may be terminated by either party upon thirty days' written notice in the event of substantial failure by the other party to perform in accordance with the terms thereof through no fault of the terminating party. In the event of any termination, ENGINEER will be paid for all services rendered and reimbursable expenses incurred to the date of termination and, in addition, all reimbursable expenses directly attributable to termination.

5.4   Use of Documents

5.4.1   All Documents are instruments of service in respect to this Project, and ENGINEER shall retain an ownership and property interest therein (including the copyright and the right of reuse at the discretion of the ENGINEER) whether or not the Project is completed.

5.4.2   OWNER may rely upon that data or information set forth on paper (also known as hard copies) that the OWNER receives from the ENGINEER by mail, hand delivery, or facsimile, are the items that the ENGINEER intended to send. Files in electronic media format of text, data, graphics, or other types that are furnished by the ENGINEER to the OWNER are furnished only for convenience, not reliance by the OWNER. Any conclusion or information obtained or derived from such electronic files will be at the OWNER's sole risk. In all cases, the original hard copy of the documents takes precedence over the electronic files.

5.4.3   Because data stored in electronic media format can deteriorate or be modified inadvertently or otherwise without authorization of the data's creator, the OWNER agrees that it will perform acceptance tests or procedures within 60 days, after which the OWNER shall be deemed to have accepted the data thus transferred. Any transmittal errors detected within the 60-day acceptance period will be corrected by the ENGINEER.

5.4.4   When transferring documents in electronic media format, the ENGINEER makes no representations as to long-term compatibility, usability, or readability of such documents resulting from the use of software application packages, operating systems, or computer hardware differing from those used by the ENGINEER.

5.4.5   OWNER may make and retain copies of documents for information and reference in connection with use on the Project by OWNER. ENGINEER grants OWNER a license to use the Documents on the Project, extensions of the Project, and other projects of OWNER, subject to the following limitations: (1) OWNER acknowledges that such Documents are not intended or represented to be suitable for use on the Project unless completed by ENGINEER, or for use or reuse by OWNER or others on extensions of the Project or on any other project without written verification or adaptation by ENGINEER; (2) any such use or reuse, or any modification of the Documents, without written verification, completion, or adaptation by ENGINEER, as appropriate for the specific purpose intended, will be at OWNER's sole risk and without liability or legal exposure to ENGINEER or to ENGINEER's Consultants; (3) OWNER shall indemnify and hold harmless ENGINEER and ENGINEER's Consultants from all claims, damages, losses, and expenses, including attorneys' fees, arising out of or resulting from any use, reuse, or modification without written verification, completion, or adaptation by ENGINEER; (4) such limited license to OWNER shall not create any rights in third parties.

5.4.6   If ENGINEER at OWNER's request verifies or adapts the Documents for extensions of the Project or for any other project, then OWNER shall compensate ENGINEER at rates or in an amount to be agreed upon by OWNER and ENGINEER.

# Exhibit A

5.5    Controlling Law
This Agreement is to be governed by the laws of the State of Illinois.

5.6    Mutual Waiver of Consequential Damages
Notwithstanding any other provision of this Agreement to the contrary, neither party including their officers, agents, servants and employees shall be liable to the other for lost profits or any special, indirect, incidental, or consequential damages in any way arising out of this Agreement however caused under a claim of any type or nature based on any theory of liability (including, but not limited to: contract, tort, or warranty) even if the possibility of such damages has been communicated.

5.7    Limitation of Liability
In no event shall ENGINEER's total liability to OWNER and/or any of the OWNER's officers, employees, agents, contractors or subcontractors for any and all injuries, claims, losses, expenses or damages whatsoever arising out of or in any way related to this agreement from cause or causes, including, but not limited to, ENGINEER's wrongful act, omission, negligence, errors, strict liability, breach of contract, breach of warranty, express or implied, exceed the total amount of fee paid to ENGINEER under this agreement or $50,000, whichever is greater.

5.8    Successors and Assigns

5.8.1.    OWNER and ENGINEER each is hereby bound and the partners, successors, executors, administrators and legal representatives of OWNER and ENGINEER (and to the extent permitted by paragraph 5.8.2 the assigns of OWNER and ENGINEER) are hereby bound to the other party to this Agreement and to the partners, successors, executors, administrators and legal representatives (and said assigns) of such other party, in respect of all covenants, agreements and obligations of this Agreement.

5.8.2.    Neither OWNER nor ENGINEER may assign, sublet or transfer any rights under or interest (including, but without limitation, moneys that may become due or moneys that are due) in this Agreement without the written consent of the other, except to the extent that any assignment, subletting or transfer is mandated by law or the effect of this limitation may be restricted by law. Unless specifically stated to the contrary in any written consent to an assignment, no assignment will release or discharge the assignor from any duty or responsibility under this Agreement.

5.8.3.    Unless expressly provided otherwise in this Agreement:

5.8.3.1.    Nothing in this Agreement shall be construed to create, impose or give rise to any duty owed by ENGINEER to any Contractor, Subcontractor, Supplier, other person or entity, or to any surety for or employee of any of them, or give any rights in or benefits under this Agreement to anyone other than OWNER and ENGINEER.

5.8.3.2.    All duties and responsibilities undertaken pursuant to this Agreement will be for the sole and exclusive benefit of OWNER and ENGINEER and not for the benefit of any other party.

5.9    Notices
Any notice required under this Agreement will be in writing, addressed to the appropriate party at the address which appears on the signature page to this Agreement (as modified in writing from time to time by such party) and given personally, by registered or certified mail, return receipt requested, by facsimile, or by a nationally recognized overnight courier service. All notices shall be effective upon the date of receipt.

# Exhibit A

5.10    Severability
Any provision or part of the Agreement held to be void or unenforceable under any law or regulation shall be deemed stricken, and all remaining provisions shall continue to be valid and binding upon OWNER and ENGINEER, who agree that the Agreement shall be reformed to replace such stricken provision or part thereof with a valid and enforceable provision that comes as close as possible to expressing the intention of the stricken provision.

5.11    Changed Conditions
If concealed or unknown conditions that affect the performance of the Services are encountered, which conditions are not ordinarily found to exist or which differ materially from those generally recognized as inherent in the Services of the character provided for under this Agreement or which could not have reasonably been anticipated, notice by the observing party shall be given promptly to the other party and, if possible, before conditions are disturbed. Upon claim by the ENGINEER, the payment and schedule shall be equitably adjusted for such concealed or unknown condition by change order or amendment to reflect additions that result from such concealed, changed, or unknown conditions.

5.12    Environmental Site Conditions

It is acknowledged by both parties that ENGINEER's scope of services does not include any services related to Constituents of Concern, as defined in Article 6. If ENGINEER or any other party encounters an undisclosed Constituent of Concern, or if investigative or remedial action, or other professional services, are necessary with respect to disclosed or undisclosed Constituents of Concern as defined in Article 6, then ENGINEER may, at its option and without liability for consequential or any other damages, suspend performance of services on the portion of the Project affected thereby until OWNER: (1) retains appropriate specialist consultant(s) or contractor(s) to identify and, as appropriate, abate, remediate, or remove the Constituents of Concern, and (2) warrants that the Site is in full compliance with applicable Laws and Regulations.

If the presence at the Site of undisclosed Constituents of Concern adversely affects the performance of ENGINEER's services under this Agreement, then the ENGINEER shall have the option of (1) accepting an equitable adjustment in its compensation or in the time of completion, or both; or (2) terminating this Agreement for cause on 30 days' notice.

OWNER acknowledges that ENGINEER is performing professional services for OWNER and that ENGINEER is not and shall not be required to become an "arranger," "operator," "generator," or "transporter" of hazardous substances, so defined in the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended, which are or may be encountered at or near the Site in connection with ENGINEER's activities under this Agreement.

5.13    Insurance
ENGINEER shall procure and maintain insurance for protection from claims under workers' compensation acts, claims for damages because of bodily injury including personal injury, sickness or disease or death of any and all employees or of any person other than such employees, and from claims or damages because of injury to or destruction of property.

5.14    Discovery
ENGINEER shall be entitled to compensation on a time and materials basis when responding to all requests for discovery relating to this Project and to extent that ENGINEER is not a party to the lawsuit.

5.15    Nondiscrimination and Affirmative Action
In connection with its performance under this Agreement, ENGINEER shall not discriminate against any employee or applicant for employment because of race, color, creed, religion, age, sex, marital status,

# Exhibit A

sexual orientation or affectional preference, national origin, ancestry, citizenship, physical or mental handicap or because he or she is a disabled veteran or veteran of the Vietnam era. ENGINEER shall take affirmative action to ensure that qualified applicants are employed and that employees are treated during employment without regard to their race, color, creed, religion, age, sex, marital status, sexual orientation or affectional preference, national origin, ancestry, citizenship, physical or mental handicap or because he or she is a disabled veteran or veteran of the Vietnam era. Such actions shall include recruiting and hiring, selection for training, promotion, fixing rates or other compensation, benefits, transfers and layoff or termination.

5.16   Force Majeure
Any delays in or failure of performance by ENGINEER shall not constitute a default under this Agreement if such delays or failures of performance are caused by occurrences beyond the reasonable control of ENGINEER including but not limited to: acts of God or the public enemy; expropriation or confiscation; compliance with any order of any governmental authority; changes in law; act of war, rebellion, terrorism or sabotage or damage resulting therefrom; fires, floods, explosions, accidents, riots; strikes or other concerted acts of workmen, whether direct or indirect; delays in permitting; OWNER's failure to provide data in OWNER's possession or provide necessary comments in connection with any required reports prepared by ENGINEER, or any other causes which are beyond the reasonable control of ENGINEER.  ENGINEER's scheduled completion date shall be adjusted to account for any force majeure delay and ENGINEER shall be reimbursed by OWNER for all costs incurred in connection with or arising from a force majeure event, including but not limited to those costs incurred in the exercise of reasonable diligence to avoid or mitigate a force majeure event.

5.17   Waiver
Non-enforcement of any provision by either party shall not constitute a waiver of that provision, nor shall it affect the enforceability of that provision or of the remainder of this Agreement.

5.18   Headings
The headings used in this Agreement are for general reference only and do not have special significance.

5.19   Subcontractors
ENGINEER may utilize such ENGINEER's Subcontractors as ENGINEER deems necessary to assist in the performance of its Services.

5.20   Coordination with Other Documents
It is the intention of the parties that if the ENGINEER's Services include design then the Standard General Conditions will be used as the General Conditions for the Project and that all amendments thereof and supplements thereto will be generally consistent therewith. Except as otherwise defined herein, the terms which have an initial capital letter in this Agreement and are defined in the Standard General Conditions will be used in this Agreement as defined in the Standard General Conditions. The term *"defective"* will be used in this Agreement as defined in the Standard General Conditions.

5.21   Purchase Order
Notwithstanding anything to the contrary contained in any purchase order or in this Agreement, any purchase order issued by OWNER to ENGINEER shall be only for accounting purposes for OWNER and the pre-printed terms and conditions contained on any such purchase order are not incorporated herein, shall not apply to this Agreement, and shall be void for the purposes of the Services performed by ENGINEER under this Agreement.

## ARTICLE 6 – DEFINITIONS

6.1  Whenever used in this Agreement the following terms have the meanings indicated which are

# Exhibit A

applicable to both the singular and the plural.

6.1.1   Services
The services to be performed for or furnished to OWNER by ENGINEER described in this Agreement.

6.1.2   Agreement
This Agreement between OWNER and ENGINEER for Professional Services including those exhibits listed in Article 7.

6.1.3   Constituent of Concern
Any substance, product, waste, or other material of any nature whatsoever (including, but not limited to, Asbestos, Petroleum, Radioactive Material, and PCBs) which is or becomes listed, regulated, or addressed pursuant to [a] the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§9601 et seq, ("CERCLA")] [b] the Hazardous Materials Transportation Act, 49 U.S.C. §§1801 et seq.; [c] the Resource Conservation and Recovery Act, 42 U.S.C. §§6901 et seq. ("RCRA"); [d] the Toxic Substances Control Act, 15 U.S.C. §§2601 et seq.; [e] the Clean Water Act, 33 U.S.C. §v1251 et seq.; [f] the Clean Air Act, 42 U.S.C. §§7401 et seq.; and [g] any other federal, state, or local statute, law, rule, regulation, ordinance, resolution, code, order, or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous, toxic, or dangerous waste, substance, or material.

6.1.4   Construction Cost - ♦
The total cost to OWNER of those portions of the entire Project designed or specified by ENGINEER. Construction Cost does not include ENGINEER's compensation and expenses, the cost of land, rights-of-way, or compensation for or damages to properties, or OWNER's legal, accounting, insurance counseling or auditing services, or interest and financing charges incurred in connection with the Project or the cost of other services to be provided by others to OWNER pursuant to Article 3. Construction Cost is one of the items comprising Total Project Costs.

6.1.5   Documents
As applicable to the Services, the data, reports, drawings, specifications, record drawings and other deliverables, whether in printed or electronic media format, provided or furnished by ENGINEER to OWNER pursuant to the terms of this Agreement.

6.1.6   Contractor - ♦
The person or entity with whom OWNER enters into a written agreement covering construction work to be performed or furnished with respect to the Project.

6.1.7   ENGINEER's Subcontractor.
A person or entity having a contract with ENGINEER to perform or furnish Services as ENGINEER's independent professional subcontractor engaged directly on the Project.

6.1.8   Reimbursable Expenses.
The expenses incurred directly in connection with the performance or furnishing of Services for the Project for which OWNER shall pay ENGINEER as indicated in Exhibit A.

6.1.9   Resident Project Representative - ♦

---

♦ This provision is applicable for projects where ENGINEER provides Design, Bidding, and/or Construction Phase Services

# Exhibit A

The authorized representative of ENGINEER who will be assigned to assist ENGINEER at the site during the Construction Phase. The Resident Project Representative will be ENGINEER's agent or employee and under ENGINEER's supervision. As used herein, the term Resident Project Representative includes any assistants of Resident Project Representative agreed to by OWNER. The duties and responsibilities of the Resident Project Representative are set forth in Exhibit B, "Duties, Responsibilities and Limitations of Authority of Resident Project Representative" ("Exhibit B").

6.1.10   Standard General Conditions - ♦
         The Standard General Conditions of the Construction Contract (No. 2002) of the Engineers Joint Contract Documents Committee.

6.1.11   Total Project Costs - ♦
         The sum of the Construction Cost, allowances for contingencies, the total costs of design professional and related services provided by ENGINEER and (on the basis of information furnished by OWNER) allowances for such other items as charges of all other professionals and consultants, for the cost of land and rights-of-way, for compensation for or damages to properties, for interest and financing charges and for other services to be provided by others to OWNER under Article 3.

### ARTICLE 7 -- EXHIBITS AND SPECIAL PROVISIONS

7.1   This Agreement is subject to the provisions of the following Exhibits which are attached to and made a part of the Agreement:

Exhibit A - Engineer's Services, Owner's Responsibilities, Time for Performance, Method of Payment, and Special Provisions.

Exhibit B-1 - Professional Services Cost Breakdown

Exhibit B-2 - Billing Rates and Personnel

Exhibit C -- Water Treatment Plant Design Detailed Task List

Exhibit C-1 -- Description of Services (Provided by District)

Exhibit D -- Proposed Project Schedule

This Agreement (consisting of Pages 1 to 9 inclusive), and the Exhibits identified above constitute the entire agreement between OWNER and ENGINEER and supersede all prior written or oral understandings. This Agreement may only be amended, supplemented, modified, or canceled by a duly executed written instrument.

---

♦ This provision is applicable for projects where ENGINEER provides Design, Bidding, and/or Construction Phase Services.

# Exhibit A

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the date first above written.

OWNER:                                          ENGINEER:

By:    Keith Thomason, P.E.                     By:    Ronald D. French
Title:  General Manager                         Title:  Associate


Address for giving notices                      Address for giving notices

Rend Lake Conservancy District                  Camp Dresser & McKee Inc.
11231 Marcum Branch Road                         100 North Tucker Boulevard, Suite 550
Benton, IL  62812                                St. Louis, MO  63101

Owner and Engineer – 1/2006                              9

**Exhibit A**

EXHIBIT A
TO AGREEMENT BETWEEN
OWNER AND ENGINEER
(DESIGN SERVICES)

This is an exhibit attached to and made a part of the Agreement dated September 25, 2006, between the Rend Lake
Conservancy District (OWNER) and Camp Dresser & McKee Inc. (ENGINEER) for professional services.

1.0    ENGINEER'S SERVICES

    1.1    Design Phase

        1.1.1    Prepare for incorporation in the Contract Documents final Drawings showing the scope, extent
and character of the work to be performed and furnished by Contractor and Specifications
(which will be prepared, where appropriate, in general conformance with the sixteen-division
format of the Construction Specifications Institute).

        1.1.2    Provide technical criteria, written descriptions and design data for OWNER's use in filing
applications for permits with or obtaining approvals of such governmental authorities as have
jurisdiction to review or approve the final design of the Project, and assist OWNER in
obtaining permits from the Illinois Environmental Protection Agency and the United States
Army Corps of Engineers.

        1.1.3    Advise OWNER of any adjustments to the opinion of probable Construction Cost and any
adjustments to Total Project Costs known to ENGINEER as a result of changes in scope, extent
or character or design requirements of the Project.

        1.1.4    Prepare for review and approval by OWNER, its legal counsel and other advisors, contract
agreement forms, general conditions and supplementary conditions, and (where appropriate) bid
forms, invitations to bid and instructions to bidders, and assist in the preparation of other
related documents.

        1.1.5    Furnish five copies of the above documents, Drawings and Specifications to and review them
with OWNER.  ENGINEER will coordinate with the OWNER in distributing plans and
specifications to potential bidders.  ENGINEER will respond to requests for information during
the bidding process and will assist the ENGINEER in bid award recommendation.

    The duties and responsibilities of ENGINEER during the Design Phase are amended and supplemented
as follows:

    See Detailed Task List as Exhibit C and Description of Services as Exhibit C-1, attached.

2.0    OWNER'S RESPONSIBILITIES

    2.1    Furnish to ENGINEER, as requested by ENGINEER for performance of Services as required by the
Contract Documents, the following:

        2.1.1    Any existing data prepared by or services of others, including without limitation explorations
and tests of subsurface conditions at or contiguous to the site, drawings of physical conditions
in or relating to existing surface or subsurface structures at or contiguous to the site, or
hydrographic surveys;

        2.1.2    The services of an independent testing laboratory to perform all inspections, tests and approvals

# Exhibit A

of samples, materials and equipment;

2.1.3   Appropriate professional interpretation of all of the foregoing;

2.1.4   Environmental assessments, audits, investigations and impact statements, and other relevant environmental or cultural studies as to the Project, the site and adjacent areas;

2.1.5   Any existing field surveys for design purposes and property, boundary, easement, right-of-way, topographic and utility surveys or data, including relevant reference points;

2.1.6   Property descriptions;

2.1.7   Zoning, deed and other land use restrictions; and

2.1.8   Other special data or consultations not covered in Article 2.

OWNER shall be responsible for, and ENGINEER may rely upon, the accuracy and completeness of all reports, data and other information furnished pursuant to this paragraph. ENGINEER may use such reports, data and information in performing or furnishing services under this Agreement.

2.2   Provide access to and make all provisions for ENGINEER to enter upon public and private property as required for ENGINEER to perform services under this Agreement.

2.3   Provide, as may be required for the Project:

2.3.1   Accounting, bond and financial advisory, independent cost estimating and insurance counseling services;

2.3.2   Such legal services as OWNER may require or ENGINEER may reasonably request with regard to legal issues pertaining to the Project, including any that may be raised by Contractor; and

2.3.3   Such auditing services as OWNER may require to ascertain how or for what purpose Contractor has used the moneys paid on account of the Contract Price.

2.4   Provide labor and safety equipment to open and protect manholes and/or to operate valves and hydrants as required by the ENGINEER.

2.5   Bear all costs incident to compliance with the requirements of the OWNER's Responsibilities.

2.6   Examine all alternate solutions, studies, reports, sketches, Drawings, Specifications, proposals and other documents presented by ENGINEER (including obtaining advice of an attorney, insurance counselor and other consultants as OWNER deems appropriate with respect to such examination) and render in writing decisions pertaining thereto.

2.7   Provide approvals and permits from all governmental authorities having jurisdiction to approve the portions of the Project designed or specified by ENGINEER and such approvals and consents from others as may be necessary for completion of such portions of the Project.

2.8   Advise ENGINEER of the identity and scope of services of any independent consultants employed by OWNER to perform or furnish services in regard to the Project, including, but not limited to, Construction Management, Cost Estimating, Project Peer Review, Value Engineering, and Constructability Review. If OWNER designates a person or entity other than, or in addition to, ENGINEER to represent OWNER at the site, OWNER shall define and set forth in an exhibit that is to be mutually agreed upon and attached to and made a part of this Agreement before such services begin,

# Exhibit A

the duties, responsibilities and limitations of authority of such other party and the relation thereof to the duties, responsibilities and authority of ENGINEER.

2.9   Furnish to ENGINEER data or estimated figures as to OWNER's anticipated costs for services to be provided by others for OWNER (such as services pursuant to paragraphs 2.1, 2.2 and 2.4 through 2.11, inclusive) and other costs  so that ENGINEER may make the necessary calculations to develop and periodically adjust ENGINEER's opinion of Total Project Costs.

3.0   <u>TIME PERIOD FOR PERFORMANCE</u>
The time periods for the performance of ENGINEER's services as set forth in Article 2 of said Agreement are as follows:

See time bar chart as Exhibit D, attached.

4.0   <u>METHOD OF PAYMENT</u>
The method of payment for Services rendered by ENGINEER shall be as set forth below:

Cost not-to-exceed basis as outlined in our detailed cost breakdown Exhibit B-1 (attached), with monthly billing based on the number of hours charged for work completed that month based on the rates listed in Exhibit B-2 (attached).  Direct costs will be billed the OWNER at cost plus an additional 5%.  Subcontracted services will be billed the OWNER at cost plus an additional 10% (excluding CCI, Benton & Associates, and Ross & Baruzzini).

Special Services are additional services requested by the OWNER that are not included in Exhibit C.  Special Services will be provided by the ENGINEER based on the written estimate provided to, and approved by, the OWNER.  The hourly rates charged for Special Services will conform to the rates provided in Exhibit B-2.

Reimbursable Expenses are additional expenses incurred during the execution of Special Services.  The cost of Reimbursable Expenses will be provided by the ENGINEER as part of the written estimate for said services.  Reimbursable Expenses will be billed the OWNER at cost plus an additional 5% for direct costs and at cost plus an additional 10% for subcontracted services (excluding CCI, Benton & Associates, and Ross & Baruzzini).

5.0   <u>SPECIAL PROVISIONS</u>
OWNER has established the following special provisions and/or other considerations or requirements in respect of the Assignment:

The ENGINEER shall coordinate the ENGINEER's efforts with the work efforts of the OWNER and the consulting engineer for a concurrent project known as the Rend Lake Conservancy District WTP Electrical Upgrade Project.

The ENGINEER shall coordinate the ENGINEER's efforts with the Illinois Environmental Protection Agency (IEPA) and the United States Army Corps of Engineers (CoE) with respect to permitting of the final design.

The ENGINEER shall abide by all Illinois Laws and District Policies concerning Conflict of Interest and Professional Ethics.

# Exhibit A

Exhibit B-1
Professional Services Cost Breakdown
Rend Lake Conservancy District WTP Design

Total Design Fee for WTP Design: $1,487,930

**Exhibit A**

Exhibit B-1
Professional Services Cost Breakdown - Benton & Associates
Rend Lake Conservancy District WTP Design

| Task Description | Associate $112.00 | PE V/SE III $112.00 | PE IV/SE I $104.00 | PE II $88.00 | SPC / TECH III $72.00 | TECH II $55.00 | TECH I $47.00 | Total Hours | Subtask Cost | Task Hours | Task Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Task 1: [illegible] | | | | | | | | | | 294 | [illegible] 7.3% |
| 1.01 Not used | | | | | | | | 0 | $0 | | |
| 1.02 Conduct internal project kick-off | 4 | 4 | 8 | | | | | 30 | $2,134 | | |
| 1.03 Conduct project kickoff & PCM | | 5 | 8 | | | | | 15 | $1,730 | | |
| 1.04 Initiate site survey | | | | | | | | 0 | $0 | | |
| 1.05 Initiate geotechnical survey | | | | | | | | 0 | $0 | | |
| 1.06 Initiate piping HDB survey | | | | | | | | 0 | $0 | | |
| 1.07 Prepare preliminary site layout | 5 | | | 10 | | 2 | | 22 | $1,992 | | |
| 1.08 Initiate geotech | | | | | 8 | | 8 | 16 | $647 | | |
| 1.09 Calculate plant hydraulic profile | | | | | | | | 0 | $0 | | |
| 1.10 Conduct TAD, HAA jar testing | | | | | | | | 0 | $0 | | |
| 1.11 Coordinate with Burns & McDonnell process | | | | | | | | 0 | $0 | | |
| 1.12 Evaluate pressure vs. new filters | | 8 | 30 | | 18 | | | 23 | $6,052 | | |
| 1.13 Evaluate clarifiers w/Stearns | | | | | | | | 0 | $0 | | |
| 1.14 Not used | | | | | | | | 0 | $0 | | |
| 1.15 Evaluate recarbonation process | | | | | | | | 0 | $0 | | |
| 1.16 Re-evaluate chlorine dioxide | | | | | | | | 0 | $0 | | |
| 1.17 Confirm plant chemical feed dose | | | | | | | | 0 | $0 | | |
| 1.18 Meet w/ SoD re: raw water intake | | | | | | | | 0 | $0 | | |
| 1.19 Confirm UV design requirements | | | | | | | | 0 | $0 | | |
| 1.20 Prepare draft P&ID | | | | | | | | 0 | $0 | | |
| 1.21 Design raw water intake | | 1 | 8 | | | | | 9 | $952 | | |
| 1.22 Design mixing equipment | | 1 | 2 | | | | | 3 | $327 | | |
| 1.23 Design chemical storage and feed systems | | | | | | | | 0 | $0 | | |
| 1.24 Design clarifier improvements | | 1 | 6 | | | | | 7 | $772 | | |
| 1.25 Design recarbonation system | | | 4 | | | | | 4 | $452 | | |
| 1.26 Design filter improvements | | 2 | 20 | | | | | 22 | $2,304 | | |
| 1.27 Design backwash pumps | | | | | | | | 0 | $0 | | |
| 1.28 Design UV disinfection equipment | | | | | | | | 0 | $0 | | |
| 1.29 Design reservoir improvements | | 4 | 10 | | | | | 14 | $1,459 | | |
| 1.30 Design high service pump improvements | | 2 | 8 | | | | | 10 | $1,064 | | |
| 1.31 Design clarifier sludge pump improvements | | | | | | | | 0 | $0 | | |
| 1.32 Design sludge lagoon improvements | | | | 4 | | 4 | | 8 | $572 | | |
| 1.33 Design wastewater pump station & force main | | | | 2 | | 1 | | 3 | $232 | | |
| 1.34 Prepare draft SCADA network layout | | | | | | | | 0 | $0 | | |
| 1.35 Prepare draft sequence of construction | 4 | 8 | 8 | 4 | | | | 24 | $2,538 | | |
| 1.36 Prepare construction cost estimate | | | | | | | | 0 | $0 | | |
| 1.37 Submit Preliminary Design (30%) for District review | | | | | | | | 0 | $0 | | |
| 1.38 Submit Preliminary Design (30%) for IEPA review | | | | | | | | 0 | $0 | | |
| 1.39 Review Preliminary Design w/District | 8 | 4 | 8 | | 8 | | | 28 | $2,940 | | |
| 1.40 Review Preliminary Design w/IEPA | | | | | | | | 0 | $0 | | |
| 1.41 Manage project task | 8 | 6 | | | | | 8 | 22 | [illegible] | | |
| Preliminary Design Subtotal [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | |
| Task 2: 50% Design | | | | | | | | | | 1850 | $166,660 42.5% |
| 2.01 CDM 30% TFG | | | | | | | | 0 | $0 | | |
| 2.02 Address District 30% Design review comments | 8 | 6 | 6 | 8 | 6 | | | 28 | $2,667 | | |
| 2.03 Address IEPA 30% Design review comments | | | | | | | | 0 | $0 | | |
| 2.04 Not used | | | | | | | | 0 | $0 | | |
| 2.05 Design raw water intake | | 14 | 41 | | 51 | | | 117 | $10,383 | | |
| 2.06 Design mixing equipment | | 4 | 12 | | 15 | | | 31 | $2,789 | | |
| 2.07 Design chemical storage and feed systems | | 24 | 40 | | 34 | | | 118 | $11,308 | | |
| 2.08 Design clarifier improvements | | | 20 | | 20 | | | 40 | $3,640 | | |
| 2.09 Design recarbonation system | | 10 | 30 | | 15 | | | 80 | $7,150 | | |
| 2.10 Design filter improvements | | 44 | 120 | | 100 | 20 | 20 | 304 | $28,758 | | |
| 2.11 Design backwash pumps | | | 10 | | | 10 | | 20 | $1,910 | | |
| 2.12 Design UV disinfection equipment | | 20 | 100 | | 120 | | | 240 | $21,300 | | |
| 2.13 Design reservoir improvements | | 50 | 150 | | 150 | | | 350 | $33,620 | | |
| 2.14 Design high service pump improvements | | 10 | 25 | | 40 | | | 75 | $6,100 | | |
| 2.15 Design sludge lagoon improvements | | | | | | | | 0 | $0 | | |
| 2.16 Design other site improvements | 25 | 85 | 90 | 40 | 110 | 40 | 30 | 420 | $34,124 | | |
| 2.17 Prepare final P&ID | | | | | | | | 0 | $0 | | |
| 2.18 Design SCADA system | | | | | | | | 0 | $0 | | |
| 2.19 Revise sequence of construction | 1 | 4 | 4 | 1 | 2 | | | 12 | $1,212 | | |
| 2.20 Conduct constructability review & value engineering | | | | | | | | 0 | $0 | | |
| 2.21 Prepare revised construction cost estimate | | | | | | | | 0 | $0 | | |
| 2.22 Submit 50% Design for District review | | | | | | | | 0 | $0 | | |
| 2.23 Review 50% Design w/District | 10 | | | 10 | | | | 20 | $2,000 | | |
| 2.24 Task project management | 14 | 3 | | | | | 2 | 19 | $2,019 | | |
| 50% Design Subtotal [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | |
| Task 3: 90% Design | | | | | | | | | | 1177 | $105,534 27.3% |
| 3.01 Address 50% Design review comments | 2 | 5 | 4 | 8 | 6 | | | 19 | $2,062 | | |
| 3.02 Not used | | | | | | | | 0 | $0 | | |
| 3.03 Not used | | | | | | | | 0 | $0 | | |
| 3.04 Not used | | | | | | | | 0 | $0 | | |
| 3.05 Conduct CDM 50% TFG review | | | | | | | | 0 | $0 | | |
| 3.06 Design raw water intake | | 7 | 25 | | 31 | | | 63 | $5,525 | | |
| 3.07 Design mixing equipment | | 2 | 4 | | 8 | | | 15 | $1,432 | | |
| 3.08 Design chemical storage and feed systems | | 17 | 35 | | 17 | | | 69 | $6,603 | | |
| 3.09 Design clarifier improvements | | 10 | 20 | | 30 | | | 60 | $5,710 | | |
| 3.10 Design recarbonation system | | 5 | 15 | | 20 | | | 45 | $3,975 | | |
| 3.11 Design filter improvements | | 22 | 50 | | 50 | 40 | | 172 | $15,984 | | |
| 3.12 Design backwash pumps | | | 10 | | 15 | 15 | | 30 | $2,330 | | |
| 3.13 Design UV disinfection equipment | | 10 | 50 | | 80 | | | 170 | $10,980 | | |
| 3.14 Design reservoir improvements | | 35 | 80 | | 40 | | | 155 | $14,540 | | |
| 3.15 Design high service pump improvements | | 5 | 10 | | 20 | | | 35 | $3,000 | | |
| 3.16 Design sludge lagoon improvements | | | | | | | | 0 | $0 | | |
| 3.17 Design other site improvements | 30 | 10 | 45 | 100 | 50 | 50 | 15 | 300 | $28,271 | | |
| 3.18 Design SCADA system | | 2 | 5 | | 15 | | | 23 | $2,156 | | |
| 3.19 Revise sequence of construction | 2 | 2 | 3 | 1 | 1 | | | 11 | $1,052 | | |
| 3.20 Prepare revised construction cost estimate | | | | | | | | 0 | $0 | | |
| 3.21 Submit 90% Design for District review | | | | | | | | 0 | $0 | | |
| 3.22 Review 90% Design w/District | 10 | | | 10 | | | | 20 | $2,000 | | |
| 3.23 Task project management | 12 | 6 | | | | | 8 | 25 | [illegible] | | |
| 90% Design Subtotal [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | |
| Task 4: 100% Design | | | | | | | | | | 979 | $90,122 22.3% |
| 4.01 Address 90% Design review comments | 2 | 6 | 8 | 10 | 8 | | | 30 | $3,385 | | |
| 4.02 Not used | | | | | | | | 0 | $0 | | |
| 4.03 Not used | | | | | | | | 0 | $0 | | |
| 4.04 Not used | | | | | | | | 0 | $0 | | |
| 4.05 Design raw water intake | | 7 | 22 | | 31 | | | 50 | $3,390 | | |
| 4.06 Design mixing equipment | | 2 | 8 | | 8 | | | 18 | $1,430 | | |
| 4.07 Design chemical storage and feed systems | | 17 | 31 | | 17 | | | 59 | $5,505 | | |
| 4.08 Design clarifier improvements | | 10 | 25 | 10 | 30 | | | 55 | $5,540 | | |
| 4.09 Design recarbonation system | | 3 | 15 | | 20 | | | 43 | $3,575 | | |
| 4.10 Design filter improvements | | 24 | 50 | | 50 | | | 125 | $11,514 | | |
| 4.11 Design backwash pumps | | | 10 | | | 10 | | 20 | $1,910 | | |
| 4.12 Design UV disinfection equipment | | 10 | 50 | | 60 | | | 120 | $10,693 | | |
| 4.13 Design reservoir improvements | | 32 | 40 | | 43 | 20 | | 135 | $12,170 | | |
| 4.14 Design high service pump improvements | | 4 | 10 | | 20 | | | 35 | $2,730 | | |
| 4.15 Design sludge lagoon improvements | | | | | | | | 0 | $0 | | |
| 4.16 Design other site improvements | 8 | 15 | 45 | 30 | 50 | 10 | 6 | 167 | $14,719 | | |
| 4.17 Design SCADA system | | | | | | | | 0 | $0 | | |
| 4.18 Revise sequence of construction | 2 | 2 | 7 | 2 | | | | 13 | $1,262 | | |
| 4.19 Revise construction cost estimate | | | | | | | | 0 | $0 | | |
| 4.20 Submit 100% Design for District review | | | | | | | | 0 | $0 | | |
| 4.21 Review 100% Design w/District | 8 | | 3 | 8 | | | | 14 | $2,440 | | |
| 4.22 Address 100% Design review comments | 2 | 6 | 6 | | 6 | | | 20 | $2,253 | | |
| 4.23 Submit revised 100% Design to IEPA for approval | | | | | | | | 0 | $0 | | |
| 4.24 Submit revised 100% Design to CoE for approval | | | | | | | | 0 | $0 | | |
| 4.25 Meet w/EPA | | | | | | | | 0 | $0 | | |
| 4.26 Meet w/CoE | | | | | | | | 0 | $0 | | |
| 4.27 Address IEPA & CoE comments & submit 100% Design | 2 | | | | | | | 3 | $336 | | |
| 4.28 Distribute plans & specs | | | | | | | | 0 | $0 | | |
| 4.29 Address RFIs, attend pre-bid meeting, prepare addenda | | 2 | 4 | | 4 | | 2 | 12 | $1,030 | | |
| 4.30 Review bids & make award recommendation | | 2 | 2 | | | | | 4 | $434 | | |
| 4.31 Task project management | 4 | 6 | | | | | 8 | 18 | $2,416 | | |
| 100% Design Subtotal [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | |
| Total Hours per Employee Classification | 173 | 607 | 1477 | 313 | 1434 | 187 | 108 | 4305 | | | |
| Total Cost per Employee Classification | $19,354 | $67,984 | $153,085 | $30,108 | $104,838 | $7,313 | $4,882 | | $388,591 | | |

| | Associate | PE V/SE III | PE IV/SE I | PE II | SPC / TECH III | TECH II | TECH I |
|---|---|---|---|---|---|---|---|
| Hours/Week for Project Duration | 10 | 37 | 94 | 20 | 105 | 12 | 12 |
| Percentage of Project Hours | 4.0% | 14.1% | 34.3% | 7.3% | 33.2% | 3.3% | 2.5% |

| Direct Costs | Units | Cost/Unit | Amount |
|---|---|---|---|
| Subconsultant (Geo., Horner Shifrin, [illegible]) | 1 | $ 30,150.00 | $ 30,150.00 |
| Mileage | 4400 | $ 0.50 | $ 2,200.00 |
| Hotel | 25 | $ 80.00 | $ 2,000.00 |
| Meals (Per Diem) | 33 | $ 50.00 | $ 1,650.00 |
| Misc. (Printing, postage, copies) | 1 | $ 1,300.00 | $ 1,300.00 |
| | | Total Cost | $ 37,300.00 |

# Exhibit A

Exhibit B-1
Professional Services Cost Breakdown - Ross & Baruzzini
Rend Lake Conservancy District WTP Design

**Exhibit A**

Exhibit B-2
Billing Rates and Personnel
Rend Lake Conservancy District WTP Design

The following personnel were either listed in CDM's proposal or are currently envisioned as working on this project.

## CDM Personnel

**Officer / Senior Technical Advisor ($190)**
Leonard Rago, P.E.
Steven Medlar, Ph.D., P.E.
Christopher Yamaya, P.E.
William O'Donnell, P.E.

**Principal / Associate ($165)**
Ron French
Lance Schideman, Ph.D., P.E.
Steve Amrein, P.E., S.E.
John Jacobs, P.E.

**Project Manager ($140)**
David Eike, P.E.
Gary Grimes
David Tucker, P.E.
Scott Lindell, P.E.

**Senior Engineer ($130)**
Mark White, P.E.
Todd Stalnaker
Ken Bauer

**Mid-Level Engineer ($110)**
Amrou Atassi, P.E.
Sambasiva Muddhanna, P.E.
Pamela Rede, R.G., E.I.T.
Clark Brown

**Junior Engineer ($95)**
Valerie Holland, E.I.T.
Abbie Rodrigue
CJ Roebuck
Donnielle Jordan

**CADD ($75)**
Charles Allen
Oscar Roman
B. Sid Zeller

**Administration ($55)**
Sam Henderson
Leah Fehl
Timothy Blinn
Candice Szczepanik
Cindy Falce

Page 1 of 3

# Exhibit A

Exhibit B-2
Billing Rates and Personnel
Rend Lake Conservancy District WTP Design

## Benton & Associates Personnel

**Associate ($112)**
Ed DeGroot
George Lockhart, P.L.S.

**PE V / SE III ($112)**
Reginald H. Benton, P.E., S.E.
S. John Callse, P.E.

**PE IV / SE I ($105)**
William J. Sleeman, P.E.
Nathan Frankenhoff, P.E., S.E.

**PE II ($88)**
D. Brad Hoots, P.E.
Brian Martin, P.E.
James Powell, P.E.

**SPC / TECH III ($72)**
Kenny Sturgeon, P.L.S.
William Gardner
D. Gregory Hillis
Mark Sorrill
Michael McEvers

**TECH II ($56)**
Tahnya Black
David Hays

**TECH I ($47)**
Linda Hickey
Gary Cawthon
Tracy Tavender

# Exhibit A

Exhibit B-2
Billing Rates and Personnel
Rend Lake Conservancy District WTP Design

## Ross & Baruzzini Personnel

**Officer / Senior Technical Advisor ($185)**
Bill Overturf, P.E.

**Senior Project Manager ($150)**
Jim Heisserer, P.E.

**Department Manager ($140)**
John Palmieri, P.E.
Steve Duda, P.E.

**Senior Engineer ($125)**
Bob Wilson, P.E.
Warren Kohm, P.E.
Jack Waterbury, P.E

**Mid-Level Engineer ($105)**
Andy Nicks
Mike McAdon, P.E.
Jim Ward, P.E.
Joe Rapisardo

**Junior Engineer ($82)**

**CADD ($65)**
Brad Gilmore
Matt Bergheger
Zak Lee
Kent Richardson

**Administration ($60)**
Brooke Peterson
Monica Clark
Sherrie Weber

# Exhibit A

# Exhibit C
# Water Treatment Plant Design
# Detailed Task List

CDM has proposed completing design work within a 9-month schedule. To do this, we have broken out work into a systematic series of subtasks that break down work into definable, manageable units of work.

## Task 1: Preliminary Design (30% Design)

This task will result in extensive activity at the District's water treatment plant for the first four to six weeks. Subtasks include:

1.01   Not used.

1.02   Conduct internal project kick-off meeting.

1.03   Conduct project kick-off workshop with District.

1.04   Conduct site survey that includes all features within the fenceline, a 100-ft wide strip from the fenceline to the raw water pump station, and 50-ft wide strip along proposed sanitary sewer force main alignment (does not include preparation of any easements nor a WTP property survey).

1.05   Conduct bathometric survey of raw water intake (to a distance of 50 feet from the face of the existing intake). This survey will confirm water depth at the raw water intake and will attempt to identify underwater obstructions that could pose construction challenges.

1.06   Conduct piping survey using high-definition surveying (HDS, or 'laser scanning') for the filter pipe gallery, high service pump area, and raw water pump pipe gallery. The use of laser scanning provides a high degree of accuracy for measurement of in-place piping (which includes many non-standard, field-fabricated fittings) and equipment. The resulting survey file also provides a three-dimensional model that will assist with constructability analysis.

1.07   Prepare preliminary site layout drawings. Using the recently conducted site survey as the base, a preliminary site layout, beginning with Figure 4-2 from the June 20, 2006 study prepared by CDM as a starting point, will be established and detailed.

1.08   Conduct geotechnical field work (currently assuming no more than 12 borings totaling no more than 360 feet). Borings will be placed based on preliminary site layout locations of areas with significant structures.

1.09   Analyze hydraulic profile for new facility (at 15 mgd, 20 mgd, 27 mgd, and 30 mgd). A hydraulic profile drawing will be prepared for each flowrate with water elevations at key locations identified. This analysis will identify 'choke points' in the treatment system

C-1

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

which will require improvements.  Calculations will be prepared in a technical memorandum format for review by the District.

1.10    Conduct jar tests for PAC T&O effectiveness and HAA and THM formation potential. Five sets of jar tests with up to six jars each will be conducted.  Each test run will be analyzed for T&O effectiveness (MIB) and HAA or THM formation.  A technical memorandum will be prepared that will outline results and recommendations.

1.11    Coordinate with Burns & McDonnell on electrical & SCADA system improvement project.

1.12    Evaluate whether renovation of existing filters vs. installation of new prefabricated filters and building will be the more cost-effective installation (for 27 mgd facility).  A more detailed analysis of the existing filter upgrade will be conducted and estimated.  A stand-alone filter building with pre-fabricated filters will also be evaluated and estimated.

1.13    Conduct detailed evaluation of existing clarifiers with Graver Water.  Graver Water personnel will conduct detailed inspections of the existing clarifiers with CDM Team personnel to prepare a detailed list of improvements required for each unit.  These inspections will require that the District dewater each clarifier for inspection.

1.14    Not used.

1.15    Evaluate the use of carbonic acid vs. gaseous $CO_2$ for pH stabilization.  This will include estimating storage requirements and chemical feedrates as well as estimating capital and operating costs for each option.

1.16    Evaluate the use of chlorine dioxide as a primary disinfectant.  The extent of this evaluation will be driven by results of jar testing.

1.17    Re-calculate chemical use requirements and waste flows for new WTP (at 27 mgd and 30 mgd).  This analysis includes quantities for PAC, lime, alum, polymer, sodium hypochlorite, aqueous ammonia, and hydrofluosilicic acid for chemicals.  Filter backwash and clarifier sludge quantities will also be re-calculated.

1.18    Meet with Corps of Engineers to discuss modifications to the raw water intake.  This meeting will be used to establish the criteria for final approval by the Corps of any improvements made to the raw water intake.

1.19    Calculate UV design requirements and evaluate required equipment types and sizes.  This includes building and equipment sizing.

1.20    Prepare draft P&ID for the entire treatment process.  This draft P&ID will be used and revised extensively through the duration of this task.

1.21    Prepare preliminary design of raw water intake.  Improvements include sizing and locating primary and secondary raw water intakes (keeping entrance and screen velocities less than 1 ft/s), analyzing and sizing pumps, piping improvements, reviewing of intake screen cleaning options, looking at construction staging options (with and without

# **Exhibit A**

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

temporary pumps), reviewing access for pump and piping removal, draft design of cathodic protection system, and assessing secondary raw water main connection options.

1.22   Prepare preliminary design of new and modified mixing equipment. This includes locating and sizing in-line static mixer, resizing equipment and basins to accommodate flowrates, and assessing how modifications will be constructed.

1.23   Prepare preliminary design of chemical feed systems for lime, PAC, alum, polymer, chlorine, ammonia, and fluoride. Work will include locating and laying out each system, selecting equipment and options, and addressing construction sequencing for each system.

1.24   Prepare preliminary design of clarifier modifications and new clarifier layout. Based on Graver and CDM Team inspections and hydraulic modeling, improvements will be outlined and placement of a fifth clarifier (if required) will be analyzed. Cathodic protection of the piping will also be designed.

1.25   Prepare preliminary design of recarbonation system. Based on outcome of carbonic acid vs. liquid $CO_2$ improvements include analysis of counter-current gas transfer systems, preliminary sizing of a traditional recarbonation basin, and preliminary sizing of equipment.

1.26   Prepare preliminary design of new/rehabbed filters (this scope assumes that work will proceed with the rehab option for this and future subtasks). Improvements include sizing of new filters and filter building addition; reviewing demolition requirements for the existing filters; evaluating options for isolating clearwell under the existing filters; analyzing filter-to-waste options; assessing filter, media, and underdrain equipment options; replacement of filter control panels, and assessing construction staging constraints and options.

1.27   Prepare preliminary design of new backwash pumps. Improvements include sizing backwash pumps and determining cost-effective location options.

1.28   Prepare preliminary design of new UV system. This includes equipment assessment and selection, building sizing, and providing consideration for this as a standalone project.

1.29   Prepare preliminary design of new 3-MG reservoir and improvements to existing 3-MG reservoir. Improvements include sizing and layout of the new 3-MG reservoir for minimum $T_{10}/T_{th}$ rating of 0.5, staging to isolate the existing 3-MG reservoir for improvements, and recommending modifications to the existing 3-MG reservoir to also meet a $T_{10}/T_{th}$ rating of 0.5.

1.30   Prepare preliminary design of high service pump improvements. This will include analysis of options to add two additional high service pumps that will allow existing high service pumps and wet well to be taken off-line. This will also include improvements to the existing high service pump discharge piping and valves.

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

1.31  Prepare preliminary design of clarifier sludge piping improvements. This includes analyzing existing piping for size and preparing a proposed piping layout.

1.32  Prepare preliminary design of new sludge lagoon and lagoon polishing. Work includes layout of an additional sludge lagoon, assessing modifications to the backwash polishing lagoon, and preparing a preliminary lagoon effluent system to adjust pH and monitor flow.

1.33  Prepare preliminary design of wastewater pump station and force main. Includes sizing pumps and force main, locating new duplex submersible pump station, preliminary routing of new force main, and confirming tie-in point for sanitary sewer.

1.34  Prepare draft SCADA network layout. Layout will address basic system operation and interaction of master control panel with local control panels.

1.35  Prepare draft sequence of construction. This task will consider constructability issues with each area and incorporate them into a proposed sequence of construction that will identify equipment and system shutdown options and restrictions as well the impact of component construction on other systems within the facility.

1.36  Prepare construction cost estimate using CCI estimators. The 30% design will be submitted for CCI review.

1.37  Submit preliminary design for District review and comment.

1.38  Submit preliminary design to IEPA for comment.

1.39  Meet with District to review preliminary design.

1.40  Meet with IEPA to discuss preliminary design.

1.41  Manage project task. This subtask includes general project coordination and scheduling, regular status reporting to the District, and management of project financials (timesheet review, expense report review, subcontracts, and invoicing).

Deliverables for this task include:

☐ A revised WTP report for submittal to IEPA.

☐ A technical memorandum for hydraulics calculations.

☐ A technical memorandum for jar testing results and recommendations.

☐ A technical memorandum comparing rehabilitation and expansion of the existing filters vs. installation of all new filters in a new pre-engineered filter building.

☐ A technical memorandum comparing recarbonation using liquid $CO_2$ vs. carbonic acid.

☐ Minutes of meetings with the District.

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

☐ A construction cost estimate of the 30% design.

☐ Three sets of 30% design drawings and specifications (one full-size drawing set, two half-size drawing sets).

☐ A draft sequence of construction.

## Task 2:  50% Design

As work progresses beyond Task 1, all the disciplines of the CDM Team begin to become more involved with the project. Equipment, tank, and piping sizes are set. Electrical loads are established. Basic drawings are improved, detailed drawings are started, and specifications are updated to address project specific issues.

2.01   Conduct CDM 30% design technical review committee (TRC).  This review will bring experienced CDM water treatment plant designers, building designers, and construction personnel into the process for candid third-party review of the design.

2.02   Address District 30% design review comments.

2.03   Address IEPA review comments.

2.04   Not used.

2.05   Design raw water intake improvements.  Structural design modifications will become more dominant in driving this task.  Piping layouts will be finalized and preliminary electrical and control work will also begin.

2.06   Design mixing equipment improvements.  Design will progress with the in-line mixer and modifications required for the existing rapid mix basin.

2.07   Design chemical storage and feed equipment improvements.  With feedrates and equipment sizing established, new layouts and demolition of old systems while keeping the existing facility in operation will be further considered and work will now progress towards more detailed design for each of these systems:

2.07.1   Lime system.  Improvements to the storage and day bins will be detailed.  New slurry systems will be designed as well as new transfer piping and dust collection equipment.

2.07.2   Alum system.  New storage and feed system layout will be established.

2.07.3   PAC system.  Changes to the existing PAC storage will be finalized.  The new day tank and feed system will be located and detailed.

2.07.4   Polymer system.  The polymer feed location will be determined and the equipment layout will be set.

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

      2.07.5  Ammonia system. Detailed layout of a new aqueous ammonia storage and feed system will progress.

      2.07.6  Fluoride system. New storage and feed system layout will be established.

      2.07.7  Chlorine system. Based on previous decisions on sodium hypochlorite and chlorine dioxide use, a revised storage and feed system will be determined and preliminary design layouts will progress.

2.08   Design clarifier improvements. Additional details for improvements will be detailed.

2.09   Design recarbonation improvements. Work will continue based on recarbonation option selected.

2.10   Design filter improvements. Work will progress with detailed design of the new filter building addition structural and architectural elements. Design details for the new filters will be developed. Improvements and sequencing for rehab of the existing filters will also be outlined.

2.11   Design backwash pumps. With established flowrates and equipment location, the backwash pump layout and piping design will continue. Electrical and control aspects of the design begin.

2.12   Design UV disinfection improvements. Design of the UV disinfection building, equipment, and piping will proceed.

2.13   Design reservoir improvements. This work includes finalizing site and piping connections, preparing preliminary tank plans and sections, evaluating improvements for the existing reservoir, and looking at construction staging.

2.14   Design high service pump improvements.

2.15   Design sludge lagoon improvements. Final layouts will be set and excavation quantities estimated. Piping layouts will be drafted and details prepared.

2.16   Design other site improvements. This work includes yard piping and force main plans and profiles.

2.17   Prepare final P&ID. Final corrections are made and all connections accounted.

2.18   Design WTP SCADA system. This task expands on Task 1 efforts with draft operating narratives for each operation.

2.19   Revise sequence of construction.

2.20   Conduct constructability and value engineering review with CCI and CDM personnel.

2.21   Prepare revised construction cost estimate using CCI estimators.

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

2.22    Submit 50% design to District for review and comment.

2.23    Meet with District to review 50% design.

2.24    Manage project task. This subtask includes general project coordination and scheduling, regular status reporting to the District, and management of project financials (timesheet review, expense report review, subcontracts, and invoicing).

Deliverables for this task include:

☐ A 30% design review meeting minutes memo with action items.

☐ A technical memorandum of the constructability and value engineering review comments with CDM Team responses.

☐ Minutes of meetings with the District.

☐ A construction cost estimate of the 50% design.

☐ Three sets of 50% design drawings and specifications (one full-size drawing set, two half-size drawing sets).

☐ A revised sequence of construction.

## Task 3:  90% Design

Work on this task expands on Task 2 work by further modifying and expanding the plans and specifications. Quality control reviews begin. Division 00 and 01 documents are completed and updated as work progresses to prepare a biddable set of construction documents.

3.01    Address District 50% design review comments.

3.02    Not used.

3.03    Not used.

3.04    Not used.

3.05    Conduct CDM 60% TRC review

3.06    Design raw water intake improvements.

3.07    Design mixing equipment improvements.

3.08    Design chemical storage and feed equipment improvements.

3.09    Design clarifier improvements.

3.10    Design recarbonation improvements.

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

3.11   Design filter improvements.

3.12   Design backwash pumps.

3.13   Design UV disinfection improvements.

3.14   Design reservoir improvements.

3.15   Design high service pump improvements.

3.16   Design sludge lagoon improvements.

3.17   Design other site improvements.

3.18   Design WTP SCADA system.

3.19   Revise sequence of construction.

3.20   Prepare revised construction cost estimate using CCI estimators.

3.21   Submit 90% design to District for review and comment.

3.22   Meet with District to review 90% design.

3.23   Manage project task. This subtask includes general project coordination and scheduling, regular status reporting to the District, and management of project financials (timesheet review, expense report review, subcontracts, and invoicing).

Deliverables for this task include:

☐ A 50% design review meeting minutes memo with action items.

☐ Minutes of meetings with the District.

☐ A construction cost estimate of the 90% design.

☐ Three sets of 90% design drawings and specifications (one full-size drawing set, two half-size drawing sets).

☐ A revised sequence of construction.

## Task 4: 100% Design

Upon completion of Task 3, the primary focus of this task will be to make final corrections and get required approvals and permits. Subtasks include:

4.01   Address District 90% design review comments.

4.02   Not used.

C-8

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

4.03    Not used.

4.04    Not used.

4.05    Design raw water intake improvements.

4.06    Design mixing equipment improvements.

4.07    Design chemical storage and feed equipment improvements.

4.08    Design clarifier improvements.

4.09    Design recarbonation improvements.

4.10    Design filter improvements.

4.11    Design backwash pumps.

4.12    Design UV disinfection improvements.

4.13    Design reservoir improvements.

4.14    Design high service pump improvements.

4.15    Design sludge lagoon improvements.

4.16    Design other site improvements.

4.17    Design WTP SCADA system.

4.18    Revise sequence of construction.

4.19    Prepare revised construction cost estimate using CCI estimators.

4.20    Submit 100% design to District for review and comment.

4.21    Meet with District to review 100% design.

4.22    Address District 100% design review comments.

4.23    Submit revised 100% design to IEPA for review and approval.  This includes submitting for NPDES permit renewal.

4.24    Submit revised 100% design to Corps of Engineers for review and approval.

4.25    Meet with IEPA to review comments.

4.26    Meet with Corps of Engineers to review comments.

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

4.27    Address IEPA and Corps of Engineers comments and submit final plans and specifications to the District for bidding.

4.28    Distribute plans and specifications. CDM will coordinate sending plans and specifications to all contractors, suppliers, and other interested parties that request a copy. CDM assumes that up to 50 sets of documents will required to be sent. CDM also assumes that reproduction costs will be offset by non-refundable fees charged to all recipients.

4.29    Address requests for information, schedule and attend a pre-bid meeting, and prepare and forward necessary addenda. Included in this task is the preparation of pre-bid meeting minutes. This task assumes a maximum 45-day bidding period.

4.30    Review bids and make project award recommendation. CDM will review bids for compliance with the contract documents, completeness, and accuracy and make a written recommendation of contract award.

4.31    Manage project task. This subtask includes general project coordination and scheduling, regular status reporting to the District, and management of project financials (timesheet review, expense report review, subcontracts, and invoicing).

Task 4 will be completed with the following deliverables:

- ☐ A 90% design review meeting minutes memo with action items.

- ☐ An IEPA construction permit for the WTP improvements.

- ☐ An IEPA NPDES permit renewal for lagoon discharge.

- ☐ A Corps of Engineers permit for raw water intake improvements.

- ☐ Minutes of meetings with the District.

- ☐ A construction cost estimate of the 100% design.

- ☐ One set of reproducible drawings and specifications. In addition to this set, a CD-ROM with drawings and specifications in Adobe PDF format will be provided.


The following items are specifically not included in this Detailed Task List, but can be provided as Special Services as outlined in the Agreement:

- Designing seismic upgrades to existing buildings.

- Conducting a water treatment plant property survey and property survey required for preparing legal descriptions for force main easements.

- Designing upgrades to the existing buildings for compliance with the 28 CFR Part 36 – Americans with Disabilities Act (ADA).

# Exhibit A

*Exhibit C*
*Water Treatment Plant Design*
*Detailed Task List*

- Designing removal of asbestos and other hazardous materials encountered as part of this project.

- Designing special fire protection systems beyond those required by local codes for proposed structures and updating fire protection systems in existing buildings.

- Preparing separate procurement packages to pre-purchase equipment (this project will have two bid packages – one for the water treatment plant upgrade and another for the stand alone UV disinfection building, equipment, and piping).

- Designing hydraulic surge protection systems in excess of surge protection valving at the water treatment plant.

# Exhibit A

Exhibit C-1

## DESCRIPTION OF SERVICES
### DESIGN SERVICES FOR WTP CAPACITY EXPANSION

**Project Implementation Method:**    Design-Bid-Build
**Billing Method:**    Not-to-Exceed Cost with Monthly Billing at Agreed Hourly Rates.
**Design Time:**    12 Months Including Obtaining IEPA and Army Corp Permits.
**Required Capacity:**    27 mgd expandable to 30 mgd.

**Raw Water Pump Station:**
    Reuse the existing concrete structure.
    Construct 2 new intake screens with control valves, and air scour and/or chemical cleaning system.
    Convert existing opening to emergency opening.
    Max velocity = lesser of; 1 ft/s or manufacturers recommendation.
    Replace existing pumps (2 @ 20 mgd, 1 @ 14 mgd).
    Replace existing piping header and valves.
    Include provision for future 36" raw water line.
    Use bypass pumping system to facilitate construction.
    The motors and electrical controls for the raw water pump station are being replaced as part of the Electrical Upgrade Project being designed separately.
    Obtain Army Corps permit.

**Raw Water Line:**
    Reuse the existing 36" welded steel raw water line.
    Install cathodic protection.
    Install an in-line static mixer near the water plant.

**Rapid Mix Chamber:**
    Reuse the existing concrete structure.
    Adjust the height of the structure for changes in the hydraulic profile.
    Add structural support below rapid mix.
    Replace the existing mixer.

**Clarifier Influent Line:**
    Reuse the existing 48" welded steel clarifier influent line.
    Install cathodic protection.
    Reuse the existing concrete diversion structure.
    Adjust the diversion chamber height for changes in the hydraulic profile.

# Exhibit A

Exhibit C-1

**Clarifiers:**
Reuse the 4 ea, 61' diam, Graver Reactor clarifiers with tube settlers.
Peak loading rate = 2 gpm/sf of tube settlers.
Replace the motors, gears, shafts, and bearings for the mixers and the scrapers.
Replace the weirs and tube settlers.
Replace and/or repair any significantly deteriorated components.
Replace the cathodic protection.
RLCD has loaded 2 clarifiers to 7 mgd each. There was 0" of freeboard at the diversion chamber and 14" of freeboard in the clarifiers.
Construct new clarifier effluent piping to the filters.

**Re-carbonation:**
Prepare operating cost projections for carbonic acid Injection in lieu of conventional re-carbonation basin.
Install cost effective re-carbonation system.

**Value Engineering - Filters:**
Target filter loading rate = 3.5 gpm/sqft.
Install redundant backwash pump.
Install automated backwash systems.

Complete a value engineering review of the following filter options:
1. Expand the existing filter room and rehab the existing filters in place.
Construct brick building addition and 4 additional filters.
Replace existing under-drains, media, and surface washers.
Replace filter influent piping, filter effluent piping, and backwash supply piping.
Add filter-to-waste piping.
or
2. Construct a stand alone filter building.
Construct a pre-engineered metal building.
Construct filter influent piping, filter effluent piping, filter-to-waste piping, backwash supply piping, and backwash waste piping.

**UV Disinfection:**
Furnish 100% complete, stand-alone plans for the installation of a UV disinfection system to be installed as part of a future contract.
Construct any necessary pipe T's and valves.

# Exhibit A

Exhibit C-1

**Existing Outdoor 3 mgal Clearwell:**
Clean, seal, and install baffles. Req'd T10/T = 0.5
Construct effluent piping to the proposed, outdoor, 3 mgd clearwell.

**Proposed Outdoor 3 mgal Clearwell:**
Construct a new, 3 million gallon, underground clearwell.
Req'd T10/T = 0.5
Construct effluent piping to the existing clearwell under the filter gallery.

**Existing 1 mgal Clearwell:**
Modify as necessary to accommodate new hydraulic profile and filter piping changes.

**High Service Pumping:**
Reuse existing pumps.
The pump motors and controls are being replaced as part of the Electrical Upgrade Project.
Replace the control valves on the pump effluent header.

**Standby High Service Pumping:**
Construct standby high service pumps.
2 pumps required at 6900 gpm @ 300' TDH.
Install VFD on 1 of the pumps.
Route electrical service to standby generators being constructed with electrical upgrade project.
Standby high service pumps must allow the existing high service room, high service clearwell, and the proposed electrical room to be taken out of service.

**SCADA:**
The SCADA system for the Water Treatment Plant shall pace the raw water pumps to the high service pump clearwell level. All chemical feed systems shall be paced to the flow and the process monitoring.
The SCADA system for the Distribution System will be constructed as part of the separate electrical upgrade project.
The 2 SCADA systems will be stand-alone systems with separate terminals for operation by different personnel.

**Instrumentation & Control:**
Construct instrumentation and controls for process units.
Construct instrumentation and controls for chemical feed systems.
Install all required process monitoring equipment.

# Exhibit A

Exhibit C-1

**Chemical Feed Systems:**
Replace the following chemical feed systems:

| | | |
|---|---|---|
| PAC | Alum | Polymer |
| CO2 | NaOCl | NH3 |
| Fluoride | ClO2 | |

(Convert NH3 to AquaAmmonia)
Upgrade the following chemical feed systems:
Lime
Eliminate the following chemical feed systems:
KMnO4

**Process Waste:**
Rehab the sludge blow-down piping.
Construct 1 additional sludge lagoon.
Construct a combination pH adjustment and secondary settling basin for the lagoon effluent.
Renew the NPDES permit.
No waste effluent recycling is proposed.

**Building Improvements:**
Upgrade the HVAC for the entire plant.
Remodel the existing control room.
No remodeling of the office space, laboratory, shop, or common areas is proposed except as necessary to accommodate the HVAC designs.
Laboratory equipment replacements will be performed separately.

**Plumbing:**
Rehab the existing plant water supply system to feed the process vessels and chemical feed systems.
Fill the existing septic tanks and install a small sewage pump station and approximately 0.5 miles of sewage forcemain.
No other improvements to the existing potable water supply or domestic waste plumbing are proposed.

# Exhibit A

Exhibit C-1

**Electrical:**

**Electrical Upgrade Project**
The Electrical Upgrade Project being designed separately will address all of the medium voltage loads (2400V & 4160V).
Power for the proposed plant improvements will be available in a new main electrical room in the form of 4,160V, 3 phase power.
A new standby generator will be included to support all of the loads for the completed plant.
Plans for the Electrical Upgrade Project will be furnished in October.
It is anticipated that the Electrical Upgrade Construction will be completed prior to the start of the WTP Capacity Expansion Construction.

**WTP Capacity Upgrade Project**
All low voltage (120V to 480V) process electrical shall be replaced from the main electrical room to the load; including transformers, electrical panels, cables, and conduits. (Process vessels, chem feed systems, instrumentation.)
All low voltage (120V to 480V) HVAC electrical shall be replaced from the main electrical room to the load; including transformers, electrical panels, cables, and conduits.
All other low voltage (120V to 480V) electrical shall be replaced from the main electrical room to the existing electrical panel locations; including transformers, electrical panels, cables, and conduits. Reconnect the existing loads at the panel. (Lighting, convenience outlets, non-process related fixed motor loads.)
Phone systems, alarm systems, and security systems are not required to be installed as part of this project, except to the extent necessary to support the in-plant SCADA system.

**Exhibit A**

Exhibit C-1

**Administration:**
Conduct monthly progress review meetings with the District Engineer.
Review design summary with IEPA at 30% plan stage.
Submit plans to District for review @ 50% and 100%.
Secure construction permit(s) from IEPA.
Modify plans for District and regulatory agency comments.
Issue plans to bidders.
Assist District in evaluating bids.

**Cost Control:**
Provide formal submittal to CDM construction division at 50% plan stage.
Provide formal constructability review comments from construction division to District.
Provide cost estimate at final plan stage.
Incorporate bid alternates to achieve District budget goals. The current construction contract budget is $21.5 million, excluding engineering. The District reserves the right to increase the budget. The consultant will not be responsible for redesign work if the District elects to reduce the budget goal, or for work added outside of the original scope.
Assist the District in negotiating cost savings measures if the construction bids are more than 5% over the engineers estimate and/or the District's budget goal at the time of the bid.

# Exhibit A



**Exhibit A**



**Exhibit A**